COMPANIA DE VAPORES ARAUCO PANAMENA S. A. v. MOORE–McCORMACK LINES, Inc. et al.

THE GLORIA.

No. 18198.

United States District Court
E. D. New York.

April 27, 1950.

546

Pyne, Lynch & Smith, New York City, for libelant (Dudley C. Smith and Anthony V. Lynch, Jr., New York City, advocates).

Burlingham, Veeder, Clark & Hupper, New York City, for respondent (Burton H. White and Hervey C. Allen, Jr., New York City, advocates).

J. Vincent Keogh, U. S. Atty., Brooklyn, N. Y., for respondent-impleaded (William H. Postner, New York City, advocate).

KENNEDY, District Judge.

In this suit the owners of S. S. Gloria seek to charge respondent Moore-McCormack Lines, Inc. (Moore-McCormack) with negligence that caused damage to the ship's No. 2 'tween deck in the way of No. 2 hatch. The vessel was, at the time of the incidents involved, under a uniform time charter to the United States of America (Warshiptime Form 101); the government had designated Moore-McCormack as berth agents under a uniform berth agency agreement, and also had engaged the firm to act as stevedore under a government contract known as Warshipsteve. Between April 12th and April 21, 1945 the Gloria was laden by Moore-McCormack with 8,251 tons of general cargo at Pier B, Jersey City. When the ship arrived at Santos some time late in May damage was discovered in the No. 2 'tween deck at the place I have mentioned. A good part of the cargo stowed in that area had fallen into the hold as a result of the collapse of the hatch coaming and deck.

Gloria's owners sued Moore-McCormack purely on the theory of negligence; the United States of America was thereupon brought in as a respondent by Moore-McCormack under a claim for indemnity based on the berth agency agreement. The basic facts are substantially undisputed: the only real fact question is the ultimate one of causation.

Prior to the commencement of the loading, Gloria's master had conferred with Moore-McCormack's representatives. A rough stowage plan had been prepared as a basis for the conference; the master insisted that heavy cargo, especially steel rails, should, so far as possible, be placed in the lower holds, because he knew his ship to be tender. But when the loading of the lower holds had been substantially completed, a number of steel rails, part of a larger shipment, arrived late. On April 18, 1945, Moore-McCormack began to put these rails into the No. 2 'tween deck in the way of No. 2 hatch, after the Chief Officer had been apprised of the circumstances. On the same day Gloria's master became personally aware that rails were being put in the No. 2 'tween deck. He complained about possibility of damage to hatch boards, and referred to his original desire that heavy cargo be put in the lower holds. The circumstances (late arrival) were explained to him, and he did not demand that the rails be removed. On April 20, 1945, it developed that during the previous night bundles of steel sheets had been placed on top of the late-arrived rails at the forward starboard side of the square of the hatch. The master again objected. But it should be emphasized at this point that the master's protests during the loading were never on the basis that the cargo taken into the No. 2 'tween deck was excessive in weight: he was concerned at first (1) about stability, and later (2) about possible damage to the hatch boards. There was still some room in the holds on April 18th, but it was not sufficient to take the rails.

The hatches were closed on April 20th (the original sailing date) but the No. 2 'tween deck cargo was neither restowed nor shut out. The master and the chief officer, at the completion of loading, in fact signed a certificate to the effect that they had inspected all of the cargo and that they had found it loaded and checked to their satisfaction.

On April 22nd Gloria sailed alone. But when she reached Cape Hatteras she was

ordered to anchor in the Chesapeake to await a southbound convoy. During all this and subsequent periods Gloria handled well, and there was no trouble about stability.

On April 23rd Gloria joined a convoy for Santos. On April 27th Gloria's master heard what he called in his smooth log "a sharp detonation" during the first watch. He sounded the hatches but found them dry. The ship's log made reference then and thereafter to rough weather during the voyage, in the course of which she pitched and rolled, sometimes "heavily".

On arrival at Santos it was found that the ship's No. 2 'tween deck in the way of No. 2 hatch had been badly damaged and that the cargo stowed there, or a large portion of it, had, as said before, been dumped into the hold. On May 28th (at Santos) Gloria's master filed a protest to the effect that he had encountered heavy weather. Subsequently, however, he took the position that the cause of the damage was not heavy weather, but excessive loading in the No. 2 'tween deck. This brings me to a description of the stow in that deck, and the damage which was discovered at Santos.

Gloria's length is 403 feet, her beam 52 feet 4 inches, and her depth 29 feet 1¼ inches. She has 13 cargo compartments (four lower holds, four lower 'tween deck compartments, four bridge or shelter deck compartments, and one additional compartment, an orlop deck forward, just below the level of the No. 2 'tween deck). The No. 2 'tween deck compartment in which the damage occurred is 70 feet long and 52 feet 4 inches wide; the No. 2 hatch is 18 feet wide and 33 feet long. This means that between the fore and aft (longitudinal) hatch coamings and the wing bulkheads there is on each side a space of 18 feet 2 inches. Between the transverse hatch coamings and the transverse bulkheads there is a space both forward and aft of the square of the hatch approximately 21 feet long. The compartment varies in height from 8 feet 8½ inches to 7 feet 4½ inches. The steel rails (concerning which specific complaint is made) were 33 feet

long, but they were stowed in such fashion that only 11 feet of their length bore on the hatch boards, their remaining length running to the forward transverse bulkhead. Dunnage was supplied, so that the rails rested evenly on the deck as well as on the hatch boards. The steel plates were stowed on top of the rails.

In the compartment where the damage occurred there was stowed cargo weighing in total approximately 300 tons. Of this amount only about 140 tons bore directly on the square of the hatch—roughly 70 tons on the forward portion and 70 tons on the after portion. (While there was much debate on this point, it seems to me that this is the only permissible finding, in the light of the master's testimony, the stowage plan, and all other available material in the record.)

The damage found at Santos was extensive. There are a number of photographs showing the area of damage, and so I need not describe it in great detail. It is, however, necessary for clarity to say at this point that the whole hatch structure was found to be hogged down in the center. The forward hatch coaming was practically flattened downward and the deck plates in the starboard forward corner were sheared. The hatch beams had all fallen out of place as a result of the fact that the flanges which fit into the sockets had either been sheared off (or chewed) to such an extent that they could no longer remain in place. There was no evidence whatever that the cargo had gotten adrift; for example, there was no damage either to the stanchions or to any other structures in the 'tween deck, which would be consistent with such a finding. There was no damage to any other 'tween deck compartment, although in every one of them cargo had been stowed on the square of the hatch.

The libelant puts forward the theory that the disaster occurred on April 27th, when the "detonation" was heard in the hold. On that day the ship was pitching and rolling and shipping water on deck, if her log is to be believed. Moreover, subsequent log entries show that the ship went through the same type of weather (April

29th, May 3rd, May 5th, May 10th, May 11th, May 12th, May 14th, May 20th, May 21st, May 22nd, May 23rd). On some of these occasions the word "heavily" is used to describe the motion of the ship. (Incidentally, respondent Moore-McCormack criticizes all of the log entries in the case on the ground that the rough logs were never produced.)

Certainly at the time of the discovery of the damage the master of Gloria, who above all persons should know his own ship, ascribed it to heavy weather. It is also clear that he was satisfied with the stow when he left New York, except for possible want of stability (which did not occur), or damage to the hatch boards, which is a far cry from a claim of excessive weight. When the disaster occurred, or what caused it necessarily rests in conjecture.

Two experts testified for the libelant, and each was sure that the damage was caused by excessive weight in a small area. But neither could account for the fact that the excessive weight did not make itself manifest until at least April 27th (the "detonation"), seven days after the stow had been completed. The more persuasive of the two experts called by libelant was sure that the damage was to be explained by a *sudden* shock downward. He had made no metalurgical examination (or procured none) of the deck plates and other members which had given way, and he ruled out metal fatigue as the cause of the damage only by a surface examination of the fabric of the ship.

On the libelant's side it is true that Gloria had carried in safety a number of cargoes prior to the voyage of April 22nd, and that she was maintained in her class. But any one even slightly familiar with marine disasters of this kind knows that a history of prior safe carriage of cargo is not at all inconsistent with a sudden subsequent failure of some part of the ship's structure: this is notably true in the case of scows and barges, the most fertile source of litigation of this type, even though such cases are not completely analogous with this one. Under all the circumstances, it is quite impossible for me to say that even one proximate cause of the disaster was overloading.

And there is another element of libelant's claim to be considered, namely, the question of foreseeability. In this case Moore-McCormack was acting as a stevedore— an independent contractor, assumed to have skill in its calling. There was vigorous debate at the trial concerning where the ultimate responsibility for unsafe loading should be placed as between the master and the stevedore, and the advocates cited many cases on the point. I doubt very strongly that any general answer to this question can be found or ought to be attempted. It is obvious, however, under the specific facts of this case that Gloria's master could have had no intimation that his 'tween deck could not bear the load put upon it, otherwise he surely would not have sailed. The protest about stability and possible damage to hatch boards brings home to him personally the nature and quality of the stow. And even were this not so, the evidence shows plainly that the ship's officers were in a position to satisfy themselves both from the stowage plan and from the operation itself concerning where the various items of cargo were placed. Stowage of steel rails in a 'tween deck is not unusual. In fact, such stowage is quite common. Nor is stowage on the square of a hatch in itself improper. And specifically in this case the master and chief mate of Gloria both expressed satisfaction with the stow in writing. I do not intimate that any one of these matters or all of them taken together could confer an immunity upon the stevedore against negligence. I do suggest, however, that a stevedore cannot be expected to foresee a danger or a risk to which the master himself is blind.

Libelant suggests that (on the question of foreseeability) the captain's certificate of proper stowage and (on the question of causation) his protest at Santos, inferentially ascribing the damage to heavy weather, are both to be ignored as mere formalities. I am not prepared to take the responsibility of a master quite so lightly.

All of this leads to the conclusion that the libelant has not sustained its burden of proof against respondent Moore-McCormack. The complaints of libelant that this respondent did not come forward with exculpatory proof overlook, it seems to me, the essential nature of the charge which libelant makes in its pleadings, and the burden which it elected to assume.

Moore-McCormack urges that even if the libel is dismissed, it is entitled to indemnity for counsel fees and other expenses under Articles 8 and 16a of the berth agency agreement. But the charge made by Gloria's owners against Moore-McCormack is negligence in the stevedoring operation, which was the subject of a separate contract containing, so far as I can find, no clause under which indemnity can be had for the negligence of Moore-McCormack in that capacity, nor for any expenses to which the stevedore may be put in defending such a claim. An ingenious argument is offered by Moore-McCormack: that whether or not cargo should be taken or shut out was a decision properly referable to the berth agency agreement, in respect of which Moore-McCormack was an agent entitled to indemnity for any liability to which it was subjected in connection with such decisions. But libelant's claim that excessive weight was placed upon a small area is not at all the same as a claim of a wrong decision in the over-all plan of operation. One can conceive many circumstances in which the general plan is perfectly proper, but the execution negligent. The very fact that two contracts were made, and that Moore-McCormack assumed two capacities, is evidence of an intention to keep its functions separate—to indemnify under one set of circumstances but not under another. What was here involved was a specific claim of negligent conduct by an independent contractor who, concerning the particular obligation be performed, had no recourse to an indemnity agreement.

The libel should be dismissed against Moore-McCormack with costs; the impleading petition should also be dismissed with costs.