**BNP PARIBAS MORTGAGE CORPORATION and BNP Paribas, Plaintiffs,**

v.

**BANK OF AMERICA, N.A., Defendant.**

**Deutsche Bank AG, Plaintiff,**

v.

**Bank of America, N.A., Defendant.**

**Nos. 09 Civ. 9783 (RWS), 09 Civ. 9784 (RWS).**

United States District Court, S.D. New York.

March 23, 2011.

378

Boies Schiller & Flexner LLP, by: Robin A. Henry, Esq., Motty Shulman, Esq., Jack Wilson, Esq., Armonk, NY, for Plaintiffs BNP Paribas Mortgage Corporation and BNP Paribas.

Williams & Connolly LLP, by: William E. McDaniels, Esq., Stephen D. Andrews, Esq., Stephen P. Sorensen, Esq., Daniel M. Dockery, Esq., Katherine O'Connor, Esq., Washington, DC, for Plaintiff Deutsche Bank AG.

Munger, Tolles & Olson LLP, by: Marc T.G. Dworsky, Esq., Kristin Linsley Myles, Esq., Gregory Weingart, Esq., Richard St. John, Esq., Los Angeles, CA, King & Spalding LLP, by: Richard T. Marooney, Esq., New York, NY, for Defendant Bank of America, N.A.

*OPINION*

SWEET, District Judge.

TABLE OF CONTENTS

I. PRIOR PROCEEDINGS ............................................ 381

II. THE FACTS ALLEGED .......................................... 382
 A. Background ................................................ 382
 B. The Facility Documents .................................... 384
 i. The Base Indenture ................................... 385
 ii. The Security Agreement ............................... 388
 iii. The Depositary Agreement ............................ 389
 iv. The Custodial Agreement ............................. 390
 v. The March 2009 Letter ............................... 392
 C. Alleged Breaches .......................................... 393

III. THE APPLICABLE STANDARD .................................. 394

IV. THE AMENDED COMPLAINTS STATE A CLAIM FOR BREACHES OF THE BASE INDENTURE AND BREACH OF FIDUCIARY DUTY ..... 394
 A. The Complaints State a Claim under Section 10.4 of the Base Indenture ..... 394
 B. The Amended Complaints State a Claim for Breach of Section 9.1 of the Base Indenture ..................................... 400
 C. The Amended Complaints State a Claim for Breach of Fiduciary Duty ..... 400
 D. DB's Claims under the Prior Version of the Base Indenture and Other Facility Documents Fail as a Matter of Law ................. 401

V. THE AMENDED COMPLAINTS STATE A CLAIM FOR BREACH OF
THE SECURITY AGREEMENT ........................................ 402
 A. The Amended Complaints State a Claim that BoA Breached the
Security Agreement by Transferring Funds for Prohibited Purposes..... 403
 B. Plaintiffs State a Plausible Claim for Breach of the Security Agreement
Based on BoA's Improper Post–Event of Default Conduct and Failure
to Confirm the Borrowing Base Condition ............................. 406
 C. The Amended Complaints also State a Claim that BoA Failed to
Properly Segregate Collateral ....................................... 407

VI. PLAINTIFFS LACK STANDING UNDER THE DEPOSITARY AND
CUSTODIAL AGREEMENTS AND THE MARCH 2009 LETTER .......... 408
 A. Plaintiffs Lack Standing to Sue for Breach of the Depositary Agreement..... 408
 B. The BNP Plaintiffs Lack Standing to Sue under the March 2009 Letter..... 411
 C. Plaintiffs Lack Standing to Sue for Breach of the Custodial Agreement..... 413

VII. PLAINTIFFS FAIL TO STATE A CLAIM FOR INDEMNIFICATION ........ 415
 A. Plaintiffs' Indemnification Claims under the Custodial Agreement Fail..... 416
 B. Plaintiffs' Indemnification Claims under the Depositary and Security
Agreements Fail .................................................... 418

VIII. PLAINTIFFS LACK STANDING TO SUE BASED ON OCALA NOTES
ISSUED BEFORE JULY 20, 2009 ..................................... 418

IX. BNPP IS NOT A PROPER PARTY TO THIS ACTION ...................... 420

X. CONCLUSION ............................................................ 421

In these related actions, Defendant Bank of America, N.A. ("BoA" or "Defendant") has moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaints filed by Plaintiffs BNP Paribas Mortgage Corporation ("BNP") and BNP Paribas ("BNPP") (collectively, the "BNP Plaintiffs") and Deutsche Bank AG ("DB"). For the reasons set forth below, the motion is granted as to the claims for breach of the Depositary Agreement, Custodial Agreement, and March 2009 Letter, as to the claims for indemnification, and as to claims relating to Ocala Notes issued prior to July 20, 2009, and denied as to all remaining claims.

As will become evident from what follows, these actions involve highly sophisticated financial institutions, which participated in various capacities in the residential mortgage industry prior to its recent collapse. They were, and are, represented by some of the most prominent law firms in the country whose very skilled advocates have been of great assistance to the Court, despite the contrary conclusions they have drawn from the complicated documents that created the relationships at issue.

## I. PRIOR PROCEEDINGS

BNP and DB each filed initial Complaints against BoA on November 25, 2009, and each filed Amended Complaints on March 17, 2010.[1] BNP added BNPP, its parent company, as a new plaintiff in its Amended Complaint.

In its Amended Complaint, DB asserts eight causes of action for breach of contract, alleging that BoA breached the cur-

---

1. Hereafter, the Amended Complaint filed by DB will be referred to as the "DB AC" and the Amended Complaint filed by the BNP Plaintiffs will be referred to as the "BNP AC."

rent and prior versions of four contracts that created and governed a facility for the origination, sale, and purchase of home mortgages through Taylor, Bean & Whitaker Mortgage Corp. ("TBW") and its wholly-owned subsidiary, Ocala Funding, LLC ("Ocala") (the facility hereafter referred to as the "Ocala Facility"). These contracts—the Security Agreement, the Depositary Agreement, the Custodial Agreement, and the Base Indenture—are described collectively as the "Facility Documents." In addition to its breach of contract claims, DB asserts a claim for breach of fiduciary duty and seeks indemnification under the current and prior versions of the Depositary, Security, and Custodial Agreements.

BNP does not bring any claims under the prior versions of the Facility Documents, but otherwise echoes DB's claims, with the addition of a claim for "Breach of Contract/ Indemnification" under a March 27, 2009 side letter (the "March 2009 Letter").

On August 30, 2010, BNP and DB filed new actions against BoA in the Southern District of Florida, in which BNP and DB allege two causes of action for conversion of certain mortgage loans and the sale proceeds of those loans. On November 17, 2010, the actions were transferred to the Southern District of New York and referred to this Court. On November 23, 2010, BoA filed a motion to dismiss both actions. The motion was heard on January 26, 2011, and remains *sub judice.*

The instant motions were heard and marked fully submitted on September 15, 2010.

## II. THE FACTS ALLEGED

### A. *Background*

This dispute arises generally from the multi-billion dollar collapse of TBW in late summer 2009. According to the Amended Complaints, TBW was "the largest non-depositary residential mortgage lender in the United States" and the "twelfth-largest mortgage originator." (BNP AC ¶ 25; DB AC ¶ 2.) Its core business was "(i) originating, underwriting, processing and funding conforming, conventional, government-insured residential mortgage loans; (ii) the sale of mortgage loans into the 'secondary market' to government-sponsored enterprises such as Federal Home Loan Mortgage Corporation ("Freddie Mac"); and (iii) mortgage payment processing and loan servicing." (BNP AC ¶ 26.) In 2008, TBW was responsible for originating approximately $30 billion in new loans. (*Id.*) As of June 2009, it was servicing mortgages with unpaid principal balances in excess of $80 billion. (*Id.*)

TBW created Ocala in 2005 to provide short-term liquidity to TBW between the time of TBW's origination or purchase of mortgages and the sale of those mortgages, principally to Freddie Mac. (*Id.* ¶ 28.) Ocala raised cash by issuing liquidity notes in two series—Series 2005–1 Secured Liquidity Notes (the "2005–1 Notes") and Series 2008–1 Secured Liquidity Notes (the "2008–1 Notes") (collectively, the "Ocala Notes")—which were, at all times, secured by the cash proceeds of those notes and mortgages. (*Id.* ¶¶ 39, 43; DB AC ¶¶ 3, 7, 34.) BNP purchased $480.7 million of the Ocala Notes, and DB purchased $1.2 billion. (*See* BNP AC ¶¶ 2, 40; DB AC ¶¶ 4, 11.) The Ocala Notes "rolled over" at least once per month up to and through July 20, 2009, the date of the final rollover before TBW's collapse. (*Id.* ¶ 5.)

Ocala's assets were cash and mortgages, and its liabilities were the Ocala Notes and subordinated notes, totaling approximately $1.75 billion. (DB AC ¶¶ 11, 12, 47, 124.) The proceeds of the Ocala Notes were used to purchase mortgages originated by

TBW, which Ocala would in turn sell to Freddie Mac or other mortgage purchasers. (*Id.* ¶ 40.) All mortgages acquired from TBW and all proceeds from the sale of those mortgages served as collateral securing the Ocala Notes. (*Id.*) If certain conditions were satisfied, the proceeds could be used by Ocala to purchase additional mortgages from TBW, which it would then resell. (*Id.*)

TBW was Ocala's sole owner, its only member with an economic interest, and the servicer of Ocala's loans. Notices provided to Ocala were to be sent to TBW, and TBW signed the Facility Documents on Ocala's behalf. (BoA Mem. 11.)

BoA served in several distinct but related capacities for the Ocala Facility: as Indenture Trustee, Collateral Agent, Depositary and Custodian. In its various capacities, BoA agreed to administer and regulate the flow of mortgages and cash in and out of Ocala, certify the solvency of Ocala prior to its issuance of Ocala Notes, promptly notify the Ocala noteholders of any Event of Default or Potential Event of Default, as defined in the Facility Documents, and shut down the Ocala Facility upon certain Events of Default. (DB AC ¶ 23.)

On or about August 3, 2009, TBW's offices were raided by law enforcement authorities, TBW stopped originating mortgages, and Freddie Mac terminated TBW's eligibility to sell and service Freddie Mac loans. (*See* DB AC ¶¶ 207–08.) On August 10, 2009, BoA declared an Event of Default under the Base Indenture. In the wake of TBW's collapse, Ocala has failed to repay, and indeed cannot repay, the money owed to DB and BNP, in their capacity as holders of the Ocala Notes. (*See* DB AC f 214; BoA Mem. 1)

DB, BNP, and BNPP also served in multiple roles in TBW's mortgage operations, not just as holders of the Ocala Notes, but also as Swap Counterparties, Note Dealers, Qualified Counterparties and investment bankers for TBW. (BoA Mem. 11–15.)

DB and BNPP, the parent of BNP, served as Swap Counterparties under the Swap Agreements, to which BoA was not a party. Through the swap transactions, which consisted of a "front swap" with Ocala and a "back swap" with TBW, certain of Ocala's risks were transferred to the Swap Counterparties and from them onto TBW. Under the front swap, the Swap Counterparties agreed (1) to pay to Ocala the interest cost of its debt in exchange for the interest income Ocala earned on its mortgage loans and (2) to reimburse Ocala for any losses on the sale of its mortgage loans in exchange for receiving from Ocala any profits it earned on its loan sales. The back swaps mirror the front swaps. Under normal operations, if the Swap Counterparties received money from Ocala under the front swaps, they would forward that money to TBW; conversely, if they paid a net amount to Ocala under the front swaps, they would be reimbursed by TBW. According to BoA, the only funds not "round-tripped" between Ocala and TBW via the Swap Counterparties were the fees that DB and BNP Paribas retained for serving as Swap Counterparties. (*See* BoA Mem. 12–14.)

BoA contends that this arrangement was designed to help insulate Ocala from the risk of TBW's becoming insolvent by placing the Swap Counterparties between TBW and Ocala. Thus, according to BoA, DB and BNPP were paid substantial fees to absorb TBW's credit risk under the Ocala program by agreeing to pay on the front swaps even if TBW failed to pay Ocala for its own obligations.

In their capacity as Swap Counterparties, DB and BNPP explicitly acknowl-

edged and consented to the Purchase Agreement, a Facility Document not at issue in this litigation. The Purchase Agreement is an agreement between TBW and Ocala that provided the terms for the sale to Ocala of mortgages originated by TBW, and TBW's control of the purchase of those mortgages by Ocala. BoA, which was not a party to the Purchase Agreement, contends that the Purchase Agreement placed responsibility for many of the sale, purchase, and asset management functions within the Ocala Facility "squarely on TBW and Ocala." (BoA Mem. 11–12.)

In addition, Plaintiffs' affiliates, BNP Paribas Securities Corp. and Deutsche Bank Securities Inc., acted as Short–Term Note Dealers to market and sell the notes to investors, which ended up being their own affiliates, the Plaintiffs here. Plaintiffs' affiliates also served as the exclusive "Qualified Counterparties" under Ocala's loan sale agreements, which means they had the sole right to purchase mortgage-backed securities that TBW received in payment for Ocala's mortgage loans.

Finally, both DB and BNP served as investment bankers for TBW. In the months before TBW was raided by the FBI, DB unsuccessfully represented TBW in its efforts to raise $300 million to purchase Colonial Bank.

The importance to the Ocala Facility of BoA, in its various roles, and of DB and BNPP, in their capacity as Swap Counterparties, was reflected in a July 13, 2009 *Moody's ABCP Market Review*, which notes that:

> The administration risk is further mitigated by the resources, capabilities and credit strength of Bank of America Corporation as the trustee, collateral agent,

depositary and custodian to provide critical program support services, including: certifying the borrowing base and checking the delinquency triggers before the issuance of [Secured and callable notes]; checking in the loan files and creating a collateral transmittal report; and managing the orderly wind-down of the program.

\* \* \*

Ocala's Prime–1 rating is not highly correlated to TB & W, which is unrated. Rather, Ocala relies on funds obtained under the market value swap and from the committed buyer to repay the notes. As a result, there is a high degree of correlation between the rating assigned to Ocala's SLNs [i.e., the notes at issue in this litigation] and the ratings of the swap counterparties, BNP Paribas and Deutsche Bank AG. If one of these entities loses its Prime–1 rating, Ocala's rating may also be negatively affected.

*Moody's ABCP Market Review* at 3, 4.

### B. The Facility Documents

The rights and responsibilities of BoA, TBW, Ocala, DB and the BNP Plaintiffs with respect to the Ocala Facility are set out in the following Ocala Facility Documents: the 2008 Base Indenture (the "Base Indenture"); the 2008 Security Agreement (the "Security Agreement"); the 2005–1 Depositary Agreement (relating to the 2005–1 Notes and upon which the BNP Plaintiffs have sued) and 2008–1 Depositary Agreement (relating to the 2008–1 Notes and upon which DB has sued) (both referred to as the "Depositary Agreement"); the 2008 Custodial Agreement (the "Custodial Agreement"); and the March 2009 Letter.[2]

---

2. DB has brought separate claims for breach of the prior versions of four of these documents—specifically, the 2006 Base Indenture, the 2006 Security Agreement, the prior version of the 2005–1 Depositary Agreement, and the 2006 Custodial Agreement. Because DB

### i. The Base Indenture

The Base Indenture is an agreement between Ocala and BoA,[3] which served as the Indenture Trustee. The Base Indenture and its two Supplements, corresponding to the 2005–1 Notes and 2008–1 Notes, generally provided for the issuance of the Ocala Notes and dictated the terms for the accrual and payment of interest and principal for each series of Ocala Notes. The Supplements required Ocala to use the proceeds from the Ocala Notes only to acquire specified mortgage loans from TBW, to pay amounts owing on maturing notes, and to make other payments "as required by the Facility Documents." 2008–1 Supplement § 2.6; 2005–1 Supplement § 2.6.

The relevant and disputed portions of the Base Indenture are set forth as follows:

Section 9.1 of the Base Indenture defines two types of Indenture Events of Default. First, it defines several discretionary Events of Default that permitted, but did not require, BoA, as Indenture Trustee, to declare the Ocala Notes due and payable and to instruct Ocala to cease its purchase of mortgages. *Id.* § 9.1(a)-(e), (g)-(j), (m), and (s). One such discretionary Event of Default was Ocala's "fail[ure] to comply with any of its other agreements or covenants in, or provisions of, the [Ocala Notes] or this Base Indenture," where such breach "materially and adversely affects the interests of" DB and BNP, as noteholders. *Id.* § 9.1(e).

Second, it defines mandatory Events of Default that required BoA to declare the Ocala Notes due and payable and to in-struct Ocala to cease purchasing mortgages. *Id.* § 9.1(f), (k), (1), (q), and (r). One such Event of Default was an Event of Bankruptcy, such as Ocala's insolvency. *Id.* § 9.1(f).

A Potential Event of Default is defined as "any occurrence or event which, with the giving of notice, the passage of time or both, would constitute an Event of Default." *Id.* at Schedule I (Definitions).

Section 9.1 of the Base Indenture also states that Ocala "shall provide prompt written notice" of any Indenture Event of Default to BoA, in its capacity as Indenture Trustee under the Base Indenture and as Collateral Agent under the Security Agreement, and Plaintiffs, as Note Dealers and Swap Counterparties. *Id.* § 9.1.

Section 9.1 also provides that "[n]otwithstanding anything in this Base Indenture to the contrary, in the event that an Indenture Event of Default … occurs and is continuing," BoA shall provide Plaintiffs with written notice of such an event and shut down the Facility.

The Base Indenture sets forth representations and warranties of Ocala, as Issuer, including the representation that "[b]oth before and after giving effect to the transactions contemplated by this Base Indenture and the other Facility Documents, [Ocala] is solvent within the meaning of the Bankruptcy Code … and no Event of Bankruptcy has occurred with respect to [Ocala]." Base Indenture § 7.12. Ocala also covenanted that, "[p]romptly upon becoming aware of any Potential Event of Default or Event of Default under this Base Indenture, [Ocala] shall give … no-

---

has not alleged any material differences between the prior and recent versions of the Facility Documents, all references are to the 2008 versions of the Facility Documents, except where specifically noted.

**3.** BoA acquired LaSalle Bank National Association in 2007 and thereby assumed LaSalle's rights and obligations under the Facility Documents. Accordingly, where LaSalle was the named party in a Facility Document, they are hereafter referred to as BoA.

tice thereof" to BoA and other parties, including Plaintiffs in their capacity as Note Dealers and Swap Counterparties. *Id.* § 8.10(a). The Supplements to the Base Indenture expressly renewed these representations and warranties and specified that they were true with respect to the Series of notes to which each Supplement related, including the representation that there had been no Event of Default. *See* 2008–1 Supplement § 2.3(b) & (c); 2005–1 Supplement § 2.3(b) & (c). Ocala was required to renew these representations each time a new issuance of short-term notes was proposed—that is, each time the Ocala Notes rolled-over. *See* Depositary Agreements, Ex. C thereto at item 4.

Section 10.1 sets forth the following duties of BoA as Indenture Trustee:

(a) If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise such of the rights and powers vested in it by this Base Indenture and the Facility Documents, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs; *provided, however,* that the Indenture Trustee shall have no liability in connection with any action or inaction taken, or not taken, by it upon the deemed occurrence of an Event of Default of which a Trust Officer has not received written notice; and *provided, further,* that the preceding sentence shall not have the effect of insulating the Indenture Trustee from liability arising out of the Indenture Trustee's negligence or willful misconduct.

(b) Except during the occurrence and continuance of an Event of Default:

(i) The Indenture Trustee undertakes to perform only those duties that are specifically set forth in this Base Indenture or the Facility Documents and no others, and no implied covenants or obligations shall be read into this Base Indenture against the Indenture Trustee; and

(ii) In the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Base Indenture or the Facility Documents. However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Indenture Trustee, the Indenture Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Base Indenture. The Indenture Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Base Indenture or the applicable Facility Document (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c) Indenture Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i) This clause does not limit the effect of clause (b) of this Section 10.1.

(ii) The Indenture Trustee shall not be liable for any error of judgment made in good faith by the Indenture Trustee, unless it is proved that the Indenture Trustee was negligent in ascertaining the pertinent facts.

\* \* \*

(iv) The Indenture Trustee shall not be charged with knowledge of any default under any Facility Document, unless a Trust Officer of the Indenture Trustee receives written notice of such default.

(d) Notwithstanding anything to the contrary contained in this Base Indenture or any of the Facility Documents, no provision of this Base Indenture shall require the Indenture Trustee to expend or risk its own funds or incur any liability. The Indenture Trustee may refuse to perform any duty or exercise any right or power unless it receives indemnity satisfactory to it against any loss, liability or expense.

(Emphasis in original.)

Section 10.2 sets forth the following rights of BoA as Indenture Trustee:

Except as otherwise provided by Section 10.1 hereof:

(a) Indenture Trustee may conclusively rely and shall be fully protected in acting or refraining from acting in good faith based upon any document or other evidence provided to it believed by it to be genuine and to have been signed by or presented by the proper person.

\* \* \*

(d) The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers conferred upon it by the Base Indenture or the Facility Documents.

(e) The Indenture Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Base Indenture, any Supplement or any Facility Document, or to institute, conduct or defend any litigation hereunder or in relation hereto, at the request, order or direction of any of the Noteholders, pursuant to the provisions of this Base Indenture, any Supplement or any Facility Document, unless such Noteholders shall have offered to the Indenture Trustee security or indemnity satisfactory to the Indenture Trustee against the costs, expenses and liabilities which may be incurred therein or thereby; nothing contained herein shall, however, relieve the Indenture Trustee of the obligations, upon the occurrence of a default by the Issuer (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Base Indenture, any Supplement or any Facility Document, and to use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(f) Indenture Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Required Senior Noteholders, the Series 2005–1 Required Senior Noteholders or the Series 2008–1 Required Senior Noteholders (or, if the Senior Notes have been paid in full, the Required Subordinated Noteholders) of any Series which could be adversely affected if the Indenture Trustee does not perform such acts.

\* \* \*

(i) The Indenture Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Base Indenture.

(j) The right of the Indenture Trustee to perform any discretionary act enumerated in this Base Indenture shall not

be construed as a duty, and the Indenture Trustee shall not be answerable for other than its own gross negligence or willful misconduct in the performance of such act.

Section 10.4 provides for the performance by BoA of certain specified duties, both before and after an Event of Default. Specifically, Section 10.4 provides:

> If an Event of Default or a Potential Event of Default occurs and is continuing and if a Trust Officer of the Indenture Trustee receives written notice or has actual knowledge thereof, the Indenture Trustee shall promptly provide the Collateral Agent, the Noteholders, each Swap Counterparty, any Short Term Note Dealers and each Rating Agency with notice of such Event of Default or the Potential Event of Default, if such Notes are represented by a global note, by telephone, facsimile and electronic mail, and, if such Notes are represented by Definitive Notes, by first class mail.

Finally, Section 13.1 provides, in relevant part, "[n]otwithstanding any provisions of this Base Indenture to the contrary, the Indenture Trustee shall have no liability based upon or arising from the failure to receive any notice required by or relating to this Base Indenture or the Notes."

### ii. *The Security Agreement*

BoA served as Collateral Agent under the Security Agreement, pursuant to which BoA opened and maintained Collateral Accounts to hold Ocala's assets. *See* Security Agreement § 5.01.

The Security Agreement expressly "assigns, conveys, transfers, delivers and sets over unto [BoA] for the benefit of the Secured Parties ... and hereby grants to [BoA] for the benefit of each Secured Party ... a security interest in, control over, and lien on all of the [Assigned Collateral]," including all mortgages purchased through the Ocala Facility and all cash generated by the sale of such mortgages. *Id.* § 4.01. The Plaintiffs, as noteholders, are Secured Parties.

Section 8.01 provides that "[t]he relationship between the Collateral Agent and each Secured Party is that of agent and principal only, and nothing herein shall be deemed to constitute the Collateral Agent a trustee for any Secured Party or impose on the Collateral Agent any obligations other than those for which express provision is made herein."

Section 5.01 required BoA to establish and maintain, on behalf of the Secured Parties, a "Collateral Account," and two separate sub-accounts for the two different series of Ocala Notes. This section provides that

> [t]he Collateral Agent shall have complete dominion and control over the Collateral Account and the Issuer hereby agrees that only the Collateral Agent may make withdrawals from the Collateral Account; *provided, however,* that the Issuer ... may request withdrawals from the Collateral Account in accordance with the terms of *Section 5.03* hereof.

(Emphasis in original.)

Section 5.03 established two "waterfalls" for withdrawals: one for withdrawals on monthly "Payment Dates," *id.* § 5.03(b), and another for withdrawals on any other date, *id.* § 5.03(a). Each waterfall prioritized allowable purposes for withdrawals, such that higher priority obligations were entitled to full payment before other, lower-priority allowable payments. *Id.* Both waterfalls provided protective measures against the improper depletion of assets: (i) with the exception of certain transfers of funds to specific accounts maintained by BoA, amounts payable to DB and BNP, or amounts payable to BoA itself, the only

purpose for which Ocala could request that BoA withdraw funds from each of the sub-accounts was to purchase additional mortgage loans; (ii) "no withdrawals from the Collateral Account [were to] be made on any day" to purchase additional mortgages unless Ocala's assets exceeded its liabilities; and (iii) such withdrawals were to be made from the appropriate sub-accounts. *Id.*

Section 5.03 also provides, in relevant part:

> Any instruction delivered by [Ocala] ... pursuant to the provisions of the foregoing paragraph of this *Section 5.03* shall be effective upon receipt of written, electronic or telephonic instructions (confirmed promptly in writing) from an Issuer Agent. ...
>
> The Collateral Agent shall promptly comply with any such approved instructions made by [Ocala] ... in accordance with the provisions of the foregoing paragraphs of this *Section 5.03*; *provided* that any withdrawal and transfer pursuant to an instruction received prior to 2:00 p.m. New York City time on any day shall be made on such day.

(Emphasis in original.)

Section 6.02 provides that "[i]f any Indenture Event of Default under the Indenture shall have occurred and be continuing," then BoA

> shall have, with respect to the Assigned Collateral, the Collateral Account and the Deposited Funds, in addition to any other rights and remedies which may be available to it at law or in equity or pursuant to this Agreement or any other contract or agreement, all rights and remedies of a secured party under any applicable version of the Uniform Com-

mercial Code of the relevant jurisdictions relating to the Assigned Collateral, the Collateral Account and the Deposited Funds. ...

The same section provides that BoA's

> sole duty with respect to the custody, safekeeping and physical preservation of the Assigned Collateral, the Collateral Account and the Deposited Funds in its possession shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its fiduciary accounts generally, subject to Section 9–207 of the Uniform Commercial Code.

Section 8.01 sets forth the rights and duties of BoA as Collateral Agent. It contains identical language to that in the Base Indenture limiting the relationship between the BoA as Collateral Agent and each Secured Party to "that of agent and principal only." It states that the Security Agreement shall not "impose on the Collateral Agent any obligations other than those for which express provision is made herein" and that "[t]he Collateral Agent shall be entitled to rely, and shall be fully protected in such reliance, on any communication, direction, instrument, resolution, certificate, affidavit, paper or other document reasonably believed by it in its professional judgment to be genuine and correct and to have been signed or sent by the proper Person or Persons."

### iii. *The Depositary Agreement*

BoA served as Depositary under the Depositary Agreement[4] between itself and Ocala, and in that capacity handled the back-office mechanics of note issuances, such as establishing and maintaining the bank accounts needed for the issuance and payment of Ocala Notes. *See* Depositary

---

**4.** The two Depositary Agreements are identical in all material respects and are therefore cited as a single agreement.

Agreement § 2. Neither DB nor either of the BNP Plaintiffs is named as a party or a third-party beneficiary of the Depositary Agreement.

Prior to the issuance of Ocala Notes, including any roll-over of the Ocala Notes, BoA was responsible for certifying that BoA had all the necessary information regarding Ocala's assets and liabilities to certify that Ocala's assets exceeded the total amount of its outstanding debt and that Ocala's assets did in fact exceed its debts. Specifically, the Depositary Agreement states the following:

> The Depositary shall not issue or deliver any Short Term Note unless it shall have received a completed certificate from an Issuer Agent on the Issuance Date, each in the form of [a Borrowing Base Certificate] . . . and the Depositary, upon review, determines it can (and it does) certify as to items (1) and (2) therein.

*Id.* § 4(d).[5] Items (1) and (2) of the Borrowing Base Certificate reflect the solvency requirements for Ocala. This solvency condition is referred to as the Borrowing Base Condition.

Section 11(j) provides that BoA "shall not be accountable for the use or application by [Ocala] of Short Term Notes or the proceeds thereof." Section 11(l) provides that "[m]oney held by the Depositary in trust hereunder need not be segregated from other funds except to the extent required by law or the specific provisions hereof."

Section 15 of the Depositary Agreement, concerning successors and assign, reads as follows:

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that (a) except for the assignment by [Ocala] of its right, titles and interest hereunder to the Collateral Agent pursuant to Section 4.01(ii) of the Security Agreement and (b) except as provided in Section 16 hereof, no party hereto may assign any of its rights or obligations hereunder unless such party shall have obtained (i) the prior written consent of all parties hereto and (ii) the written confirmation of each of the Rating Agencies that such assignment will not result in a reduction or withdrawal of its then current rating, if any, of the Short Term Notes. This Agreement shall also inure to the benefit of the Indenture Trustee, which is hereby expressly declared to be a third-party beneficiary hereof. Subject to the foregoing, no Person not a party to this Agreement shall be deemed to be a third-party beneficiary hereof nor shall any Person be empowered to enforce the provisions of this Agreement, except as set forth in the preceding sentence and to the extent such Person becomes a permitted successor or assign hereunder.

### iv. *The Custodial Agreement*

As Custodian under the Custodial Agreement, BoA agreed to perform certain roles with respect to the maintenance of physical mortgage loan files as the mortgages were purchased and sold by Ocala. Neither DB nor either of the BNP Plaintiffs is named as a party or a third-party beneficiary of the Custodial Agreement.

---

5. The BNP Plaintiffs contend that only "Issuer Agents," who were "authorized to act, and to give instructions and notices, on behalf of the Issuer," could provide and sign the Borrowing Base Certificates. Only three Ocala officers—Lee Farkas, Paul Allen, and Ray Bowman-were designated Issuer Agents. (*See* BNP AC ¶ 110.)

Among other things, BoA assumed the responsibility of reviewing the loan files to ensure that they complied with the other Facility Documents and did not have any "documentary deficiencies" such as "missing signature or other manifest errors." Custodial Agreement § 4.

Though the mortgage loans were owned by Ocala, BoA was obligated to "segregate on the books of the Custodian and maintain continuous custody and control" of the mortgage files "on behalf of and in trust for [Ocala] subject to the security interest of the Collateral Agent." *Id.* § 6(b)(1). TBW and Ocala had the right to remove the mortgage files from the Custodial account in order to facilitate their sale to third parties such as Freddie Mac. *See id.* § 6(c).

BoA was required to maintain a current list of loans so that Ocala, the Collateral Agent, and the Plaintiffs, in their capacity as noteholders, would know at all times the nature and location of the mortgage notes, mortgages, and assignments of mortgages held by BoA, as Custodian. *Id.* § 9.

Section 17 of the Custodial Agreement provides for indemnification of the various parties to the agreement. Specifically, Section 17 provides the following:

> The Custodian hereby agrees to indemnify the Issuer, the Seller, the Servicer, each Swap Counterparty, their respective Affiliates, their respective directors, officers, trustees, employees and agents and their respective successors and assigns (each, an "Indemnified Party") against, and agrees to hold them harmless from, any and all claims, losses, liabilities, obligations, damages, payments, costs and expenses (including, without limitation, reasonable legal fees and expenses arising in connection therewith) which may be imposed on, incurred by or asserted against any Indemnified Party and resulting from the

> Custodian's negligence, lack of good faith or willful misconduct or the performance of or other breach of its obligations hereunder; *provided* that the Custodian shall not be liable for any portion of any such amounts resulting from the negligence or misconduct of the Issuer. The indemnifications contained herein survive any termination of this Agreement. . . .

(Emphasis in original.)

Section 19 of the Custodial Agreement sets forth various protections concerning the Custodian, including the following:

> (a) The Custodian shall have no duties or responsibilities except those that are specifically set forth herein, it being expressly understood that no duties or obligations shall be implied against the Custodian. *Provided* that the Custodian has followed the terms of this Agreement or the Issuer's instructions, the Custodian shall be under no responsibility or duty with respect to the disposition of any Mortgage Notes, Mortgages and Assignments of Mortgages while such Mortgage Notes, Mortgages or Assignments of Mortgages are not in its possession.

> \* \* \*

> (d) In the absence of bad faith on the part of the Custodian, the Custodian may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any request, instructions, certificate, opinion or other document furnished to the Custodian reasonably believed by the Custodian to be genuine and to have been signed or presented by the proper party or parties and *conforming to the requirements of this Agreement* absent notice to the contrary. . . . [I]t is expressly understood that in the case of any Mortgage Note, Mortgage, Assign-

ment of Mortgage or other documents or other request, instruction, document or certificate which by any provision hereof is specifically required to be furnished to the Custodian, the Custodian shall be under a duty to examine the same to determine whether or not it conforms to the requirements of this Agreement and to make the Certifications required by *Section 4* of this Agreement.

\* \* \*

(g) The duties and obligations of the Custodian shall only be such as are expressly set forth in this Agreement or as set forth in a written amendment to this Agreement executed by the parties hereto or their successors and assigns. In the event that any provision of this Agreement implies or requires that action or forbearance be taken by a party, but is silent as to which party has the duty to act or refrain from acting, the parties agree that the Custodian shall not be the party required to take the action or refrain from acting. In no event shall the Custodian have any responsibility to ascertain or take action except as expressly provided herein.

\* \* \*

(i) Under no circumstances shall the Custodian be obligated to verify the authenticity of any signature on any of the documents received or examined by it in connection with this Agreement or the authority or capacity of any person to execute or issue such document, nor shall the Custodian be responsible for the value, form, substance, validity, perfection (other than by taking and continuing possession of the Mortgage Notes, Mortgages and Assignments of Mortgages), priority, effectiveness or enforceability of any such documents nor shall the Custodian be under a duty to inspect, review or examine the docu-

ments to determine whether they are appropriate for the represented purpose or that they have been actually recorded or that they are other than what they purport to be on their face.

(j) The Custodian shall have no duty to ascertain whether or not any cash amount or payment has been received by the Seller, the Servicer or any third person.

(k) The Custodian is not required to produce a borrowing base report or any other report detailing the value of the Mortgage Loans.

Section 20 provides that, "[n]otwithstanding anything to the contrary contained in this Agreement, the Custodian hereby acknowledges and agrees that all the rights of [Ocala] under this Agreement have been assigned to the Collateral Agent for the benefit of the Secured Parties pursuant to the Security Agreement."

Section 25 provides that "[t]he Swap Counterparties are third-party beneficiaries to this Agreement and are entitled to the rights and benefits hereunder and may enforce the provisions hereof as if they were a party hereto."

v. *The March 2009 Letter*

On March 27, 2009, BoA issued a letter to BNPP in reference to the Depositary Agreement. The letter provides that

[a]s an inducement to [BNPP] to enter into, and/or to continue its participation in [swap transactions and periodic purchases of the rolled-over 2005–1 Notes], the Depositary hereby agrees to indemnify and hold harmless BNPP, its officers, directors, controlling persons and affiliates (collectively, the "Indemnified Persons") against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs and judgments, and any other costs, fees and expenses that any Indemnified Person

may sustain to the extent attributable to the Depositary's negligence, fraud, bad faith or willful misconduct in the performance of its duties under the Depositary Agreement (including, without limitation, its duties under Section 4(d) thereof) . . . .

BoA, as Depositary, "further acknowledges that the duties it performs under the Depositary Agreement (including its duties under Section 4(d)) play an important role in mitigating the risks that BNPP would otherwise incur." BoA's undertakings in the March 2009 Letter "extend to BNPP in its individual capacity, as Series 2005–1 Swap Counterparty and (as applicable) as a holder of Series 2005–1 Short Term Notes."

The March 2009 Letter is signed by BoA, but is not signed by Ocala.

### C. *Alleged Breaches*

The Amended Complaints allege that BoA had actual knowledge that Ocala was insolvent at least as early as January 25, 2008,[6] and nonetheless repeatedly and falsely certified the satisfaction of the Borrowing Base Condition and permitted Ocala to issue Ocala Notes in an amount greater than its assets, up to and through July 20, 2009, the last date on which the Ocala Notes rolled over. According to the Amended Complaints, on their face, each and every Certificate during this period of time reflected Ocala's insolvency, which constituted an Event of Default or a Potential Event of Default under the Base Indenture. In spite of this, BoA failed to notify Plaintiffs, in violation of its duty to notify under Section 10.4 of the Base Indenture. Instead, BoA continued to issue purportedly Secured Notes roughly every thirty days during this period, in violation of the Depositary Agreement, and permitted the continued operation of the Ocala Facility, in violation of Section 9.1 of the Base Indenture.

The Amended Complaints also allege that from at least January 25, 2008 through August 3, 2009, BoA breached the Security Agreement by transferring billions of dollars from the Collateral Account and its sub-accounts for improper purposes and upon the request of unauthorized persons, in violation of Section 5.03 of the Security Agreement. They allege that BoA failed to provide the required notice to Plaintiffs when making such transfers, when those transfers constituted Potential Events of Default under the Base Indenture.

The Amended Complaints allege that BoA violated its duties as Custodian and Collateral Agent by failing to maintain a "list of all Mortgage Loans with respect to which the Custodian holds Mortgage Notes, Mortgages and Assignments of Mortgages pursuant to" the Custodial Agreement, and by providing Plaintiffs with reports that misrepresented that the Ocala Facility was fully collateralized.

Finally, the BNP Plaintiffs have alleged that the March 2009 Letter gives them standing to sue BoA for breaching the Depositary Agreement by repeatedly and falsely certifying Borrowing Base Certificates despite its actual knowledge of Ocala's insolvency. The BNP Plaintiffs allege that BoA expressly contracted in the March 2009 Letter to indemnify BNPP for any losses sustained by it due to BoA's negligence in, among other things, certifying the Ocala borrowing base.

---

**6.** DB alleges that BoA had actual knowledge as early as January 25, 2008. (*See* DB AC ¶¶ 85–86.) The BNP Plaintiffs allege that BoA had actual knowledge as early as June 30, 2008, the date on which BNP first purchased its secured notes. (*See* BNP AC ¶¶ 13, 138.)

Plaintiffs also seek to be indemnified under the various Facility Documents for BoA's alleged negligence.

## III. THE APPLICABLE STANDARD

On a motion to dismiss pursuant to Rule 12, all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

In New York, "[i]nterpretation of the contract is a legal matter for the court and its provisions establish the rights of the parties and prevail over conclusory allegations of the complaint." *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 448 N.E.2d 445 (1983). If the "parties' intent is unambiguously conveyed by the plain meaning of the agreements, then interpretation is a matter of a law." *Aon Fin. Prods., Inc. v. Société Générale*, 476 F.3d 90, 95–96 (2d Cir.2007). "[W]here the contract is clear and unambiguous on its face, the intent o the parties must be gleaned from within the four corners of the instrument." *Fetner v. Fetner*, 293 A.D.2d 645, 646, 741 N.Y.S.2d 256 (N.Y.App.Div.2002) (citing *Nichols v. Nichols*, 306 N.Y. 490, 496, 119 N.E.2d 351 (1954)). Whether or not a contract is ambiguous is a matter of law, properly decided on a motion to dismiss. *See Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir.1999).

## IV. THE AMENDED COMPLAINTS STATE A CLAIM FOR BREACHES OF THE BASE INDENTURE AND BREACH OF FIDUCIARY DUTY

The amended complaints allege that BoA had "actual knowledge" of Ocala's insolvency and other material breaches of the Facility Documents by Ocala—each of which constituted an Event of Default or Potential Event of Default and required BoA to take certain actions under the Base Indenture—at least as early as January 25, 2008, but failed to act until August 10, 2009. (*See* DB AC ¶¶ 103, 201; BNP AC ¶¶ 139–40.) BoA's alleged actual knowledge is based on its receipt of Borrowing Base Certificates provided by Ocala. According to Plaintiffs' allegations, these Borrowing Base Certificates contained information that revealed Ocala's insolvency, even though Ocala stated on the face of the Certificates that it was solvent. These misrepresentations by Ocala and other transfer requests submitted by TBW also allegedly constituted material breaches of the Facility Documents. In addition to alleging that BoA had "actual knowledge," Plaintiffs argue that the Borrowing Base Certificates themselves constituted "written notice."

Plaintiffs allege two specific breaches of the Base Indenture: (1) that BoA breached its obligation under Section 10.4 to provide notice of these Events of Default and Potential Events of Default; and (2) that under Section 9.1 BoA was automatically required to shut down the Ocala facility once it had knowledge of Ocala's insolvency, but failed to do so. Plaintiffs also contend that BoA's fiduciary duties were triggered by actual knowledge or written notice of these Events of Default, and that BoA breached its fiduciary duties by failing to take reasonable and prudent steps to secure Ocala's assets.

In response, BoA argues that it is immunized from liability because, even if the Borrowing Base Certificates contained information from which BoA could have determined that Ocala was insolvent, the Base Indenture explicitly provides that BoA shall have "no liability" unless and until it receives formal "written notice" from Ocala. BoA also relies on language in the Base Indenture that says BoA "shall not be charged with knowledge of any default under any Facility Document" unless it receives "written notice of such a default." BoA contends that it was first provided formal written notice of an Event of Default on August 5, 2009, and took prompt action in response to that notice. Thus, according to BoA, the plain language of the Base Indenture precludes liability for the breaches alleged by Plaintiffs, and the claims therefore fail as a matter of law.

### A. The Complaints State a Claim under Section 10.4 of the Base Indenture

Under Section 10.4 of the Base Indenture, BoA was obligated to notify Plaintiffs, as noteholders, of any Event of Default or any event that had the potential to ripen into an Event of Default:

If an Event of Default or a Potential Event of Default occurs and is continuing and if a Trust Officer of the Indenture Trustee receives written notice or has actual knowledge thereof, the Indenture Trustee shall promptly provide ... the Noteholders ... with notice of such Event of Default or the Potential Event of Default.

Base Indenture § 10.4. Plaintiffs allege that BoA breached this provision by failing to notify them of Ocala's insolvency and other material breaches by Ocala, of which BoA had actual knowledge and/or had received written notice in the form of the Borrowing Base Certificates, at least as early as January 25, 2008.

BoA does not argue that Plaintiffs fail to allege actual knowledge. Rather, BoA argues that even if it possessed this alleged actual knowledge, it is immunized from liability for its failure to take action because it did not receive written notice of either Ocala's insolvency or any other material breaches by Ocala until August 5, 2009, at which point it took all required actions. In support of this contention, BoA relies on three provisions of the Base Indenture: (1) Section 10.1(a), which states that BoA "shall have no liability" for any "action or inaction" with respect to an Event of Default unless and until it receives "written notice" thereof; (2) Section 10.1(c), which states that BoA "shall not be charged with knowledge of any default under and Facility Document" unless it receives "written notice of such a default"; and (3) Section 13.1, which states that BoA "shall have no liability based upon or arising from the failure to receive any notice required by or relating to this Base Indenture or the Notes."

Section 10.1(a), by its terms, applies only "[i]f an Event of Default has occurred and is continuing." Plaintiffs interpret this language to mean that this provision does

not apply to circumstances "prior to the declaration of an Event of Default, when BoA had a duty to inform the Noteholders of a Potential Event of Default" under Section 10.4. (BNP Opp. 14; *see* DB Opp. 13–15.) In contrast, Section 10.1(b) establishes the standard of conduct for BoA prior to the occurrence of an Event of Default, namely to perform "those duties that are specifically set forth in this Base Indenture or the Facility Documents." Base Indenture § 10.1(b).

Plaintiffs contend that the written notice limitation of Section 10.1(a) does not apply to Potential Events of Default because a Potential Event of Default is defined to include "any occurrence or event which, with the giving of notice, the passage of time or both, would constitute an Event of Default." Instead, they argue that Section 10.1(b) should apply to BoA's conduct. Specifically, Plaintiffs contend that the limitation of Section 10.1(a) regarding notice to the Indenture Trustee does not, and could not, apply to Potential Events of Default because Potential Events of Default, by definition, cover only circumstances in which the notice that would trigger an Event of Default has not been given. A Potential Event of Default is "any occurrence or event which, with the giving of notice, the passage of time or both, would constitute an Event of Default." *Id.* Thus, Section 10.1(a) does not apply when determining whether BoA provided notice of a Potential Event of Default under Section 10.4. Rather, BoA's conduct in this circumstance is guided by Section 10.1(b). The question is whether BoA performed its express duties under the contract, and BoA is strictly liable for any breach of these duties as a matter of basic contract law. *See* Restatement (Second) of Contracts, ch. 11 introductory note, at 309 (1981) ("Contract liability is strict liability. It is an accepted maxim that *pacta sunt servanda,* contracts are to be

kept. The obligor is therefore liable in damages for breach of contract even if he is without fault.").

BoA insists that this interpretation fails because an Event of Default does not require a declaration in order to occur or be occurring and because Ocala's insolvency was an actual Event of Default, not a Potential Event of Default. (*See* BoA Reply 6.) BoA argues that the other claimed Events of Default—breaches by TBW under the Purchase Agreement that allegedly triggered Sections 9.1(a) and (b) of the Base Indenture—were not Potential Events of Default because they automatically "ripened" into actual Events of Default without written notice. BoA also argues that Ocala's failure to provide notice of a Potential Event of Default to BoA precludes BoA from being liable for Ocala's failure to provide required notices to BoA.

However, even if Ocala's insolvency and other material breaches automatically ripened into Events of Default, as BoA contends, the application of Section 10.1(a) upon an Event of Default provides no refuge for BoA because it expressly states that the written notice requirement "shall not have the effect of insulating the Indenture Trustee from liability arising out of the Indenture Trustee's negligence or willful misconduct." In other words, Plaintiffs allege that BoA is liable for action or inaction in the absence of written notice of an Event of Default where, as here, BoA acted without due care or engaged in misconduct.

Plaintiffs allege that BoA had actual knowledge of Ocala's insolvency, an Event of Default, and of other material breaches by Ocala, which were, at the very least, Potential Events of Default, but failed to notify Plaintiffs. Whether BoA's failure to act based on its alleged actual knowledge

constituted negligence or willful misconduct, and therefore strips BoA of the exculpatory protections of Section 10.1(a), is a question of fact unsuited to resolution on this motion.

In its reply brief, BoA argues that this proviso regarding negligence by BoA "simply reaffirms that BoA's actions after receipt of written notice are subject to the standard of care specified in the first sentence" of Section 10.1(a). This interpretation relies on BoA's reading of the contract to insulate it from liability prior to receipt of formal written notice, a reading Plaintiffs contend is contradicted by the "actual knowledge" language of Section 10.4.

BoA also relies on Section 10.1(c)(iv) to limit the kind of negligence that might give rise to liability for BoA. Section 10.1(c)(iv) states that BoA "shall not be charged with knowledge of any default under any Facility Document, unless a Trust Officers of the Indenture Trustee receives written notice of such a default." However, Section 10.1(c) only addresses circumstances under which BoA may be "charged with knowledge" of a default, a phrase commonly understood to refer to the imputation of constructive knowledge in circumstances where actual knowledge is absent. *See, e.g., Wash. Nat'l Ins. Co. v. Morgan Stanley & Co., Inc.,* No. 90 Civ. 3342, 1999 WL 461796, at *9 (S.D.N.Y. July 2, 1999) ("However, the issue is whether WNIC can be charged with knowledge of these articles even if no one at WNIC actually read them."). BoA's interpretation of Section 10.1(c) not only ignores the common meaning of the phrase "charged with knowledge," but also places Section 10.1(c) in direct opposition to Section 10.4, which expressly imposes a duty on BoA to act if a Trust Officer "has actual knowledge" of an Event of Default or Potential Event of Default.

BoA's attempt to nullify the effects of Section 10.4 and to read out the "actual knowledge" language is contrary to well-established principles of contract construction. Section 10.4 treats actual knowledge and written notice as two distinct concepts. If, as BoA argues, actual knowledge also requires written notice, then there is no distinction between written notice and actual knowledge and the Base Indenture's reference to actual knowledge is superfluous and would read a conflict into the contract. *See Galli v. Metz,* 973 F.2d 145, 149 (2d Cir.1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." (internal quotation marks omitted)). "[W]here two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect." *Perlbinder v. Bd. of Mgrs. of 411 E. 53rd St. Condo.,* 65 A.D.3d 985, 886 N.Y.S.2d 378, 381 (2009) (internal quotation marks omitted); *see also id.* ("An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation."); *accord* Restatement (Second) of Contracts § 236(a) (1979).

In the cases cited by BoA, unlike the Base Indenture in this case, the indentures at issue did not include provisions requiring the trustee to notify noteholders of potential events of default if the trustee obtained actual knowledge thereof. For example, in *Argonaut Partnership v. Bankers Trustee Co.,* No. 96 Civ.1970, 2001 WL 585519 (S.D.N.Y. May 30, 2001), the indenture provided that it was only written notice, not actual knowledge of a default that would trigger the trustee's duties. *Id.* at *2; *see also Putman High Yield Trust v. Bank of N.Y.,* 7 A.D.3d 439, 776 N.Y.S.2d 796, 796 (2004) (indenture explic-

itly defined "actual knowledge" as requiring written notice and specified the content of a written notice); *UBS Capital Am. II, LLC v. Highpoint Telecomms. Inc.*, No. 01 CIV. 8113, 2002 WL 377537, at *4–5 (S.D.N.Y. Mar. 8, 2002) (contract contained no "actual knowledge" provision and specified content of requisite written notice); *Magten Asset Mgmt. Corp. v. Bank of N.Y.*, 15 Misc.3d 1132(A), 841 N.Y.S.2d 219, 2007 WL 1326795, at *4–7 (N.Y.Sup. Ct. May 8, 2007) (contract contained no "actual knowledge" provision and required an "admission of inability to pay debts as they became due").

The only analogous case cited by BoA is *In re National Century Financial Enterprises, Inc.*, No. 2:03–md–1565, 2006 WL 2849784 (S.D.Ohio Oct. 3, 2006), in which the indentures at issue required the trustee to deliver notices once it had actual knowledge of a potential event of default. *Id.* at *6. In that case, however, the court concluded that the issue of whether the trustee had actual knowledge of a potential event of default triggering an obligation to provide notice could not be resolved on a motion to dismiss. *Id.*

Here, Plaintiffs have alleged that BoA had actual knowledge of the default, an allegation against which Sections 10.1(a) and (c) cannot be a defense without reading the "actual knowledge" language out of Section 10.4. Accordingly, it is a plausible interpretation of the Base Indenture that neither Section 10.1(a) nor Section 10.1(c) relieves BoA of its express contractual obligation under Section 10.4. The question of whether BoA had actual knowledge is a factual matter not properly resolved on this motion.

DB also contends that BoA is precluded from arguing that formal written notice was a condition precedent to its obligations under Section 10.1 based on the "prevention doctrine," because it was BoA's own breach that caused the failure of this condition. *See Semi–Tech Litig., LLC v. Bankers Trust Co.*, 450 F.3d 121, 129 (2d Cir.2006) (indenture trustee's failure to inspect certificates may not excuse its failure to comply with the duty to give notice of defaults that would have been discovered had the indenture trustee inspected the certificates); *Bank of N.Y. v. Tyco Int'l Group, S.A.*, 545 F.Supp.2d 312, 324 n. 81 (S.D.N.Y.2008) ("[I]t has been established for over a century that a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party [it]self." (internal quotation marks omitted)). DB contends that had BoA notified Plaintiffs of Ocala's insolvency and other material breached by Ocala, Plaintiffs would have been able to provide BoA with notice confirming the Events of Default and instructing BoA to shut down the Ocala Facility. Accordingly, as in *Semi–Tech*, BoA may not insist on a written notice requirement where its own breaches caused the failure of this requirement to be met. DB argues that BoA not only failed to alert Plaintiffs of Events of Default or Potential Events of Default, as required by Section 10.4, but it also provided false affirmative assurances to Plaintiffs that the Ocala facility was fully collateralized. (*See* DB AC ¶¶ 160–67.) In response, BoA argues that "[t]he notice that would have satisfied the condition for liability on BoA's part would have come from Ocala." (BoA Reply 12 n. 5.) However, even if notice from Ocala would have satisfied the condition, notice from any of the Plaintiffs also would have satisfied the condition, and they were in fact prevented from providing such notice by BoA's alleged failure to provide notice of Ocala's insolvency and material breaches, and by BoA's false certifications of the Borrowing Base Certificates.

Furthermore, to the extent that written notice of an Event of Default was required, Plaintiffs have alleged that BoA did have written notice in the form of Borrowing Base Certificates, which allegedly showed on their face that Ocala was insolvent, and which BoA reviewed and certified on a monthly basis, beginning at least as early as January 25, 2008. It was BoA's certification of the Borrowing Base Certificates on which Plaintiffs relied until August 2009. Additionally, DB has alleged that BoA received various requests for transfers that constituted written notice of material breaches of the Facility Documents by Ocala. (*See* DB AC ¶¶ 85–94, 120–133, 143–150.)

BoA argues that the borrowing base certificates cannot constitute written notice because "written notice" under the Base Indenture can mean only formal written notice. (BoA Mem. 30–33.)

However, there is no requirement in the Base Indenture that "written notice" be "formal" or conform to the format and content of the letters provided by Plaintiffs to BoA in August 2009, which BoA cites as a "model of what one would expect such 'written notice' to be." (BoA Mem. 3.) Rather, Schedule I to the Base Indenture defines "written" or "in writing" as "any form of written communication, including, without limitation, by means of telex, telecopier device, computer, telegraph or cable." Formality is not required or implied by this definition, nor is it alleged that anything in the parties' prior conduct required formal written notice. *See Phillips Petroleum Co. v. Rexene Corp.,* No. 95–1451, 1996 WL 137536, at *2 (Fed.Cir. Mar. 27, 1996) (unpublished) (holding provision requiring "written notice of . . . default" did not require "formal" or "heightened" notice, references to the agreement or its default provisions, or even the word "default" and refusing to imply such re-

quirements in a commercial contract between sophisticated parties with equal bargaining power).

Section 13.1 of the Base Indenture, entitled "Notices," upon which BoA relies, states only that notice to the BoA must be delivered to a specific mailing address (defined to include a specific e-mail address). However, it does not specify the required contents of the notice. Plaintiffs allege that the Borrowing Base Certificates were delivered to the representative of BoA in accordance with Section 13.1 of the Base Indenture. (See DB AC ¶¶ 83–88, 120–28.)

■ In the Second Circuit, a trustee may not impose any notice requirement higher than that set forth explicitly in the indenture. *See Meckel v. Cont'l Res. Co.,* 758 F.2d 811, 815 (2d Cir.1985) ("The indenture provided that notice be given by first-class, postage prepaid mail. That is all the law required Citibank to do."). To impose the additional requirement that written notice take a particular "formal" form impermissibly inserts additional terms in the Base Indenture. *See Petracca v. Petracca,* 302 A.D.2d 576, 756 N.Y.S.2d 587, 588 (2003) (noting that "[a] court may not write into a contract conditions the parties did not include by adding . . . terms under the guise of construction" and finding that a letter constituted notice of termination).

Ultimately, the question of whether the Borrowing Base Certificates and transfer requests constituted sufficient written notice under the Base Indenture is an issue of fact not appropriate for resolution on a motion to dismiss. *See generally DeLago v. Robert Plan Corp.,* No. 04 Civ. 3193, 2006 WL 489845 (S.D.N.Y. Feb. 26, 2006) (whether letters constituted written notice of default under terms of promissory notes could not be decided as matter of law).

**B. _The Amended Complaints State a Claim for Breach of Section 9.1 of the Base Indenture_**

█ Independent of BoA's duties under Section 10.4, Plaintiffs allege that BoA was obligated to declare an Event of Default under Section 9.1 as soon as it became aware of Ocala's insolvency, but failed to do so. _See_ Base Indenture § 9.1(f) & (h). The relevant provisions of Section 9.1 triggered BoA's obligation to shut down the Ocala facility, as set forth in subclauses (i)(iii) of Section 9.1.

BoA argues that it has no liability for its failure to perform the obligations in subclauses (i)(iii) of Section 9.1, even if it had actual knowledge of Ocala's insolvency, because Section 10.1(a) requires that BoA first have formal written notice. BoA also argues that it has no liability because the Section 9.1 provides that Ocala was expected to provide BoA with prompt notice of its insolvency to trigger the duties cited by Plaintiffs. (_See_ BoA Mem. 28–29; BoA Reply 12.)

However, Section 9.1 provides that "[n]otwithstanding anything in this Base Indenture to the contrary, in the event that an Indenture Event of Default" resulting from Ocala's insolvency "occurs and is continuing," BoA is obligated to shut down the Facility and provide Plaintiffs with written notice of such an event. Under New York law, the language "[n]otwithstanding anything in this Base Indenture to the contrary" trumps all other provisions, including Section 10.1. _See Int'l Multifoods Corp. v. Commercial Union Ins. Co._, 309 F.3d 76, 90–91 (2d Cir. 2002) (holding that " '[n]otwithstanding anything herein contained to the contrary' . . . overrides any inconsistent language elsewhere" in the contract); _see also N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C)_, 266 F.3d 112, 125 (2d Cir.2001) ("additional 'notwithstanding anything con-

tained herein' language plainly supersedes the broader Policy provisions"); _L & B 57th St., Inc. v. E.M. Blanchard, Inc._, 143 F.3d 88, 93 (2d Cir.1998) ("Because . . . clause provides that its application is 'notwithstanding anything herein to the contrary,' it trumps the clause guaranteeing the payment of attorney's fees and other expenses.").

Here, the "notwithstanding" language precedes the provisions that require BoA to shut down the facility, which explicitly require BoA, once it has actual knowledge of Ocala's insolvency, to instruct Ocala to cease the purchase of mortgages, notify TBW of the Event of Default and otherwise wind down the Ocala facility in accordance with the Base Indenture. Plaintiffs contend that this language renders the exculpatory provisions of Section 10.1 inapplicable.

This interpretation is consistent with the role of Indenture Trustee to ensure the payment of secured bonds. "If . . . an indenture trustee is under no enforceable obligation to act prudently to preserve and manage the trust assets in the event of default, and so to provide some reasonable assurance that the bondholders eventually receive their due, it may be asked whether the indenture does in fact secure the payment of anything." _Beck v. Mfrs. Hanover Trust Co._, 218 A.D.2d 1, 632 N.Y.S.2d 520, 527 (1995).

Accordingly, DB and BNP, as noteholders, have stated a claim for breach of Section 9.1 of the Base Indenture, which requires BoA to perform the obligations set forth in sub-clauses (i)-(iii) once it had actual knowledge of Ocala's insolvency.

**C. _The Amended Complaints State a Claim for Breach of Fiduciary Duty_**

█ Plaintiffs have alleged that after the occurrence of an Event of Default,

namely Ocala's insolvency and/or other allegedly material breaches of the Facility Documents by Ocala, BoA's duties as Indenture Trustee expanded to include a fiduciary duty to Plaintiffs, as secured holders of the Ocala Notes, and that BoA breached its fiduciary duty by failing to notify Plaintiffs and shut down the Facility, as set forth above.

BoA argues that the claims for breach of fiduciary duty fail for the same reasons that the claims for breach of the Base Indenture fail: that BoA does not assume heightened duties until there is an Event of Default, and shall have not liability until it receives written notice of such an Event of Default, including liability under any heightened fiduciary duty. BoA also argues that the claim should be dismissed because "under the specialized law relating to Indenture Trustees, no fiduciary duties can be implied outside the terms of the Indenture." (BoA Mem. 34.)

BoA relies on two cases for the proposition that prior to receipt of a contractually-sufficient notice of an Event of Default, "the duties of an indenture trustee are strictly defined and limited to the terms of the indenture." *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir.1988); *see also Meckel*, 758 F.2d at 816. These cases are inapposite here, however, in light of Plaintiffs' allegation that BoA had to act upon an Event of Default if it had "actual knowledge" of the event and that BoA had such knowledge. Furthermore, for the reasons discussed above, BoA's receipt of the Borrowing Base Certificates may in fact satisfy the "written notice" requirements of the Base Indenture and upon which BoA relies.

■ After an event of default, the indenture trustee's fiduciary duties expand by operation of New York common law, *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 935 F.Supp. 1333, 1347–48 (S.D.N.Y.1996),

such that "fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries," and "the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture," *Beck*, 632 N.Y.S.2d at 520, 527–28.

Accordingly, DB and BNP have adequately pleaded the existence of a fiduciary relationship between BoA and DB and BNP, as noteholders, and have also adequately pleaded BoA's breach of that fiduciary duty. *See Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F.Supp.2d 292, 304 (S.D.N.Y.2005) (stating elements).

BoA's motion to dismiss this claim is denied.

### D. *DB's Claims under the Prior Version of the Base Indenture and Other Facility Documents Fail as a Matter of Law*

■ In addition to its claims under the current version of the Base Indenture, DB also seeks relief under the prior, superseded version of the Base Indenture and other Facility Documents, on the theory that the new agreements do not expressly release claims under the old ones. However, under New York an agreement that expressly supersedes earlier versions is dispositive even absent such an express release provision. In *L–3 Communications Corp. v. OSI Systems, Inc.*, No. 02 Civ. 9144, 2004 WL 42276 (S.D.N.Y. Jan. 8, 2004), the court held that a claim under an earlier agreement was barred by language in the new agreement stating that the parties "desire to amend and restate the [original agreement] in its entirety." *Id.*

at *9 n. 7. The 2008 Ocala agreements contain nearly identical integration language, indicating the parties' intent to replace the prior agreements with the updated versions. (*See* BoA Mem. 79.)

The cases cited by DB are inapposite. *Primex Int'l Corp. v. Wal–Mart Stores, Inc.*, 89 N.Y.2d 594, 657 N.Y.S.2d 385, 387–88, 679 N.E.2d 624 (1997), and *General Motors Corp. v. Fiat S.p.A*, 678 F.Supp.2d 141, 148 (S.D.N.Y.2009), both turn on arbitration clauses in older agreements that expressly bound the parties even after superseding agreements were signed. Those cases also involved forum selection, rather than claims for breach of the old agreements. In *Air Support Int'l, Inc. v. Atlas Air, Inc.*, 54 F.Supp.2d 158, 163 (E.D.N.Y. 1999), the new contract had "superseding" language but did not amend and restate the old contract.

DB's claim that the rule cited by BoA applies only to settlement contracts is wrong. *See L–3*, 2004 WL 42276, at *9 (letter of intent regarding joint bid for acquisition); *In re Estate of Kneznek*, 284 A.D.2d 698, 727 N.Y.S.2d 180, 181 (2001) (trust agreement); *Citigifts, Inc. v. Pechnik*, 112 A.D.2d 832, 492 N.Y.S.2d 752, 753 (1985), *aff'd mem.*, 67 N.Y.2d 774, 500 N.Y.S.2d 643, 491 N.E.2d 1100 (1986) (contract for sale of business).

Accordingly, DB's claims under the prior version of the Base Indenture and its claims under the prior versions of the other Facility Documents are dismissed.

## V. THE AMENDED COMPLAINTS STATE A CLAIM FOR BREACH OF THE SECURITY AGREEMENT

Plaintiffs allege that from at least January 25, 2008 through August 3, 2009, BoA trust officers breached the Security Agreement by improperly transferring more than $3.8 billion from the Ocala Collateral Account and its sub-accounts pursuant to written requests from TBW that showed on their face destination accounts that were not connected with the purchase of mortgages. Plaintiffs further allege that TBW would submit wire transfer requests to BoA for its "review and approval" and BoA would transfer funds out of the Collateral Account after sending TBW an email saying its request was "[a]pproved." (BNP AC ¶¶ 111–12; DB AC ¶ 143.)

Plaintiffs claim that this conduct constituted a breach of BoA's duties as Collateral Agent under the Security Agreement, because BoA failed to "secure and protect" the Ocala assets over which it had "complete dominion and control" on behalf of Plaintiffs, as noteholders. *See* Security Agreement § 5.01. Plaintiffs contend that the Security Agreement required BoA, as Collateral Agent, to use reasonable care in the custody and preservation of the Ocala assets held as collateral, and that BoA failed to do so. *See id.* § 6.02. As a result, BoA failed to satisfy its obligation under the Security Agreement to "secur[e] and provid[e] for the repayment of all amounts at any time and from time to time owing by the Issuer" to Plaintiffs. *Id.* at 1.

Specifically, Plaintiffs allege that the following conduct by BoA constituted breaches of its duties as Collateral Agent under the Security Agreement:

- BoA transferred funds from the Collateral Account for improper purposes (i.e., it allowed transfers for the purchase of "wet" mortgage loans) and failed to ensure the funds withdrawn or transferred matched the mortgage loans actually purchased (*see* BNP AC ¶ 156(i); DB AC ¶ 238);

- BoA failed to evaluate Ocala's assets and liabilities to ensure that the Borrowing Base Condition was satisfied

prior to making requested transfers and transferred funds after an Event of Default had occurred, namely Ocala had become insolvent (*see* BNP AC ¶ 156(ii); DB AC ¶ 239);

- BoA failed to implement post-Event of Default procedures, such as paying out all collateral to interested parties, including Plaintiffs (*see* BNP AC ¶¶ 11, 117–18; DB AC ¶ 242);

- BoA failed to segregate Ocala's mortgages and cash and failed to segregate collateral into the proper sub–accounts for each series of notes (*see* BNP AC ¶ 156(iii); DB AC ¶ 240);

- BoA failed to perfect security interests in mortgage loans (*see* BNP AC ¶ 56(iv); DB AC ¶ 237); and

- BoA impermissibly acted on requests from unauthorized personnel (*see* BNP AC ¶ 153; DB AC ¶¶ 141, 241).

Citing Section 8.01, BoA contends that these alleged duties are not expressly provided for in the Security Agreement and therefore do not apply to BoA, which "shall not have any duty, except as expressly provided herein." (BoA Reply 18–19.) BoA also argues that, to the extent such duties exist anywhere in the Security Agreement, they were "assigned squarely to either Ocala or TBW, and BoA expressly has no duty to monitor TBW's or Ocala's compliance with these requirements." (BoA Mem. 37.)

### A. *The Amended Complaints State a Claim that BoA Breached the Security Agreement by Transferring Funds for Prohibited Purposes*

 Plaintiffs allege that Sections 5.01 and 5.03 of the Security Agreement require BoA to monitor Ocala's requests to ensure they comply with the Security Agreement and Facility Documents. Section 5.01 permits only the Collateral Agent

to "make" withdrawals from the Collateral Account, and only allows Ocala (as well as BoA as Indenture Trustee or Depositary) to "request" withdrawals "in accordance with the terms of Section 5.03." Security Agreement § 5.01. Section 5.03 of the Security Agreement allows Ocala to "instruct according to the Facility Documents the Collateral Agent to withdraw, or order the transfer of" funds but such instructions must be "approved instructions" and must in BoA's "professional judgment" be "genuine and correct." *Id.* §§ 5.01, 5.03 & 8.01. Nonetheless, according to the Amended Complaints, BoA repeatedly made withdrawals at the request of Ocala that were unrelated to any permissible purpose under Section 5.03. (*See* DB AC ¶¶ 143–50.)

BoA contends that the Security Agreement says the opposite, specifically that Ocala "shall on any given day . . . instruct the Collateral Agent to withdraw, or order the transfer of" funds in the Collateral Account "for the following purposes in the following order of priority," and that such instructions are deemed "effective upon receipt" and BoA "shall promptly comply with any such approved instructions." Security Agreement § 5.03. BoA focuses on the terms "shall instruct" and the language indicating that such instructions are "effective upon receipt" and directing BoA to comply "promptly" as evidence that BoA did not have any duty to monitor transfer requests, and interprets the word "approved" to mean that the request must have been approved by Ocala. (BoA Reply 24.)

However, Section 5.01 does not characterize "requests" from Ocala as irrefutable orders or instructions that BoA was obligated to obey without review. Indeed, the requirement that BoA had to approve instructions suggests that its obligation to "promptly follow" payment instructions did

not require automatic compliance. Section 5.03 instructs that payment requests by Ocala may be approved only: (i) when there is no Event of Default; (ii) where the request is made "according to the Facility Documents" for specifically enumerated "purposes" in the "order of priority" dictated by Section 5.03, which includes the purchase of additional mortgage loans; and (iii) where the Borrowing Base Condition is met.

Not only does the Security Agreement give BoA the right and obligation to reject transfer requests inconsistent with the purposes set forth in Section 5.03, but, according to Plaintiffs, it also provides BoA time to monitor and evaluate transfer requests, by stating that "any withdrawal and transfer pursuant to an instruction received prior to 2:00 p.m. New York City time on any day shall be made on such day." Plaintiffs contend that this provision builds in minimum of four hours for BoA to confirm the propriety of any instruction and to honor such an "approved" instruction, because payment for the purchase of new mortgages was not due until 6:00 p.m., under Section 2.4 of the Purchase Agreement, a related Facility Document. Finally, that any withdrawal or transfer instruction was "effective upon receipt" does not mean BoA had no discretion, but rather that BoA's duties—to review the request and then, if approved, to honor the request, in compliance with Sections 5.01 and 5.03—were triggered upon receipt of the instruction. *See, e.g., Profit v. Baum*, No. 3:96CV1205 JCH, 2000 WL 502697, at *7 (D.Conn. Mar. 21, 2000) ("effective upon receipt" clause determined when receiving party's duty was triggered).

Plaintiffs also note that BoA's position that it had no duty or time to review Ocala's transfer requests to make sure they were for approved transactions is contradicted by Ocala's and BoA's contemporaneous conduct during the existence of the Facility. As alleged in the Amended Complaints, Ocala initiated a transfer request by requesting BoA's "review and approval" of a wire transfer, which BoA regularly "[a]pproved." (*See* BNP AC ¶¶ 111–12.)

Plaintiffs have alleged that BoA knew the requests from TBW were not in accordance with Section 5.03 for two reasons. First, as discussed above, BoA had actual knowledge of Ocala's insolvency, an Event of Default, at least as early as January 25, 2008, and therefore each of BoA's transfers from the Collateral Account violated Section 5.03.

Second, Section 5.03 only allows BoA to disburse funds for specifically enumerated purposes, including the purchase of new mortgage loans, and BoA's transfers to accounts designated for purposes other than the purchase of new mortgages violated this requirement. (*See* BNP AC ¶¶ 122–27.) As a related point, Plaintiffs allege that BoA received withdrawal and transfer requests from unauthorized persons and complied with those requests in contravention of its obligation under Section 5.03 not to effectuate a withdrawal at the request of anyone not properly identified as an Issuer Agent.[7] BoA does not deny that this was required, nor does it argue that the facts alleged in the Amended Complaints are inadequate to establish a breach. Instead, BoA argues that such a breach is immaterial and did not cause any "plausible" harm to Plaintiffs. (BoA Mem. 51–53; BoA Reply 30–31.) Accepting

---

7. In addition, Section 8.01 required BoA to comply with Ocala's requests only where it "reasonably believe[s] . . . in its professional judgment" such instructions are "genuine and correct" and "signed or sent by the proper Person or Persons."

Plaintiffs allegations as true, however, the fact that BoA effectuated withdrawals from unauthorized individuals in the course of TBW's fraud, which ultimately led to the draining of value from the Collateral Account, makes the materiality of this breach a factual question not appropriate for resolution at this stage. The question of what damages, if any, Plaintiffs are entitled to as a result of this alleged breach is also not appropriate for resolution on a motion to dismiss.

Plaintiffs have also alleged that BoA transferred funds without taking any steps to verify that the Borrowing Base Condition had been satisfied. Section 5.03 provides that "no withdrawals from the Collateral Account shall be made" unless the Borrowing Base Condition is met, plainly refuting BoA's assertion that it was not required to verify satisfaction of the borrowing base test.

While BoA attempts to make light of the distinction between Ocala's ability to "request" withdrawals and BoA's authorization to "make" withdrawals, such a distinction is consistent with BoA's having an obligation to review Ocala's requests and to ensure that they conformed to the requirements of Section 5.03.

Plaintiffs claim that the Security Agreement expressly requires BoA to control and reconcile the Collateral Account is bolstered by Section 6.02, which explicitly invokes U.C.C. Section 9–207, and requires BoA to use reasonable care in the custody and preservation of the Collateral Account and the assets held therein as collateral. Section 6.02's requirement of reasonable care in preserving the collateral, and Section 8.01's requirement that BoA comply only with requests BoA "reasonably believed by it in its professional judgment to be genuine and correct," and thus made "in accordance with Section 5.03," appears to have mandated that BoA monitor and control the assets and the accounts, including monitoring Ocala's and TBW's requests to determine the purposes for which the requested funds would be used to ensure, among other things, that no collateral left the Collateral Account without being replaced by other collateral of at least equal value.

The fact that BoA was obligated to certify the Borrowing Base Certificates each time Plaintiffs rolled their notes contradicts BoA's suggestion that only TBW and Ocala could know "precisely what assets were owned by Ocala on that date and the precise status of the outstanding mortgage loans." (BoA Mem. 46.) Plaintiffs have alleged that BoA received detailed reports from TBW about the mortgages that it was holding and that BoA had actual control over the collateral in the Collateral Account. Also, to the extent loans that were supposed to be held in the Collateral Account as collateral were out on bailee letter, BoA had a duty to track those bailee letters under Section 6.02 of the Security Agreement and Sections 6 and 8 of the Custodial Agreement, thus enabling it to ensure satisfaction of the Borrowing Base Condition.

Finally, BoA argues that Section 8.01 evidences the intent to exempt it from the obligations under Section 5.03. Section 8.01 provides as follows:

> The Collateral Agent shall be entitled to assume that no Indenture Event of Default under the Indenture shall have occurred and be continuing, unless an officer of the Collateral Agent charged by the Collateral Agent with the administration of any of its obligations under this Agreement or with knowledge of and familiarity with the Collateral Agent's obligations under this Agreement has actual knowledge thereof....

As discussed above, however, the fact that BoA had "actual knowledge" of Ocala's

insolvency bars it from relying on this provision and assuming the absence of an Event of Default.

Accordingly, Plaintiffs have stated a plausible claim that BoA breached the Security Agreement by transferring funds from the Collateral Account for improper purposes.

### B. Plaintiffs State a Plausible Claim for Breach of the Security Agreement Based on BoA's Improper Post–Event of Default Conduct and Failure to Confirm the Borrowing Base Condition

Section 5.03 of the Security Agreement provides that "no withdrawals from the Collateral Account shall be made on any day ... unless [the Borrowing Base Condition] is satisfied." Similarly, the Security Agreement prevents BoA from making a withdrawal or transfer if an Event of Default had occurred and was continuing. *Id.* § 5.03. Sections 6.01 and 6.02 of the Security Agreement also imposed additional duties on BoA upon the occurrence of an Event of Default, including the obligation to (1) cease making withdrawals requested by Ocala, and (2) distribute the funds in the Collateral Account to the Plaintiffs and other holders of Ocala Notes. These obligations mirror the obligations of BoA, as Indenture Trustee, under Section 9.1(f) of the Base Indenture. Plaintiffs claim that BoA breached each of these duties.

As set forth above, Plaintiffs have alleged repeatedly in their Amended Complaints that the Borrowing Base Condition was not satisfied for a period of many months and that Ocala had become insolvent, constituting an Event of Default, as early as January 25, 2008. Plaintiffs have also alleged that although BoA was aware of these facts, it nonetheless made hundreds of millions of dollars of withdrawals

and transfers of cash from the Collateral Account in violation of its duties under Section 5.03. (*See, e.g.,* DB AC ¶¶ 83–97, 120–133, 159.)

BoA argues that all duties with respect to transfers and withdrawals under Section 5.03, including the duty to confirm that Ocala satisfied the Borrowing Base Condition and was not insolvent, applied to Ocala, and not to BoA. However, the language of the Security Agreement assigns the power to "make withdrawals" to BoA, as Collateral Agent, as distinct from Ocala's right to "request withdrawals." As discussed above, the relevant language in Section 5.03 mandates that "no withdrawals from the Collateral Account shall be made" if the Borrowing Base condition is not met. Given that BoA was the only party under the Security Agreement authorized to make withdrawals from the Collateral Account, Plaintiffs' reading of Section 5.03, assigning the obligation to ensure that the Borrowing Base Condition was satisfied to BoA is correct.

For the reasons discussed above, none of the provisions cited by BoA containing language such as "effective on receipt" and requiring "prompt[ ]" compliance relieve BoA of its duty to confirm satisfaction of the borrowing base test. BoA also cites the provision of the Security Agreement stating that it is subject only to obligations "for which express provision is made herein." (BoA Mem. 45.) However, the Security Agreement expressly provides that "no withdrawals from the Collateral Account shall be made" to purchase mortgages unless the Borrowing Base Condition is satisfied and no Event of Default has occurred, and it is that express duty that Plaintiffs allege BoA has violated. See Security Agreement § 5.03(a), (b).

The structure of the Ocala facility is consistent with interpreting the Security Agreement as imposing on BoA the duty

to confirm the Borrowing Base Condition. As Collateral Agent, BoA had legal ownership of all of the collateral and actual possession and control of the cash collateral. As Custodian under the Custodial Agreement, BoA had actual possession of the mortgage collateral. Finally, as Depositary Agent under the Depositary Agreement and Indenture Trustee under the Base Indenture, BoA was aware of Ocala's outstanding note obligations.

As set forth above, BoA's argument that it was entitled to rely on "communications" or "directions" from TBW or Ocala does not bear on whether Plaintiffs have stated a claim, because whether BoA actually and/or reasonably "believed in its professional judgment" that the instructions it received were "correct," are questions of fact that are not appropriate for resolution on a motion to dismiss.

In response to Plaintiffs' claim that BoA failed to implement post-Event of Default actions, BoA argues that the language in Section 8.01 upon which Plaintiffs rely is an exculpatory provision that does not create a duty to act. (*See* BoA Reply 29–30.) However, it is not the language of Section 8.01 that established BoA's duty to implement the post-Event of Default actions, but rather the "waterfall" payment provision of Section 2 and the language in Section 5.03 requiring that further transfers be barred. Accepting Plaintiffs' factual assertions as true for purposes of this motion, trust officers at BoA had actual knowledge of Ocala's insolvency and, therefore, BoA was obligated to take steps to shut down the Facility and was precluded from relying on the exculpatory language of Section 8.01.

## C. *The Amended Complaints also State a Claim that BoA Failed to Properly Segregate Collateral*

The Security Agreement required BoA to establish and maintain separate "sub-accounts thereof for each of the Series 2005–1 Purchased Assets and the Series 2008–1 Purchased Assets," and that such assets "shall be deposited in the sub-account of the Collateral Account." Security Agreement § 5.01. The waterfall provisions of Section 5.03 required that withdrawals for the purchase of Series 2008–1 Mortgages were to be made only from the Series 2008–1 sub-account and withdrawals for the purchase of Series 2005–1 Mortgages were to be made only from the Series 2005–1 sub-account. *Id.* § 5.03(a)(vii)(a), (b)(ix)(a). Plaintiffs allege that not only did BoA allow improper withdrawals from each sub-account for improper purposes, but that there was "no meaningful attempt to segregate either mortgages purchased or the proceeds from the sale of mortgages." (DB AC ¶ 190.)

BoA does not deny that funds were improperly-segregated or not segregated at all, but contends that it cannot be held responsible for failing to segregate collateral because that responsibility belonged to Ocala. (BoA Mem. 48–49.) However, Section 5.01 imposed the obligation to deposit funds in the proper sub-accounts on both Ocala and BoA, and permitted BoA to withdraw funds at Ocala's request only in accordance with Section 5.03, which required that funds be withdrawn from the appropriate sub-account. The fact that Ocala may also have had a duty to segregate the funds among the sub-accounts does not relieve BoA of its responsibility.

BoA argues that Section 8.01's bar on any implied duties on BoA means that BoA did not breach any duties by failing to properly segregate collateral. However, Section 8.01 provides that the collateral need not be segregated "except to the extent required by law or the specific pro-

visions hereof." [8]

Finally, BoA contends that the phrase "shall be deposited in the sub-account" in Section 5.01 does not state which party is responsible for making such deposits, and that accordingly BoA cannot be deemed responsible for the segregation of such deposits, because the duty is not expressly provided for in the Security Agreement. However, in light of BoA's express obligations to secure and protect the collateral and to ensure that any withdrawals be made for proper purposes from proper sub-accounts, it is unclear whether the parties intended that BoA should also be responsible for ensuring that assets be deposited into the correct sub-accounts.

At a minimum, Plaintiffs have alleged a plausible claim for breach based on BoA's effectuating withdrawals from the general Collateral Account that were required to be made instead from the appropriate sub-account. More generally, accepting Plaintiffs' allegations as true, BoA's failure to ensure that the collateral was properly segregated constituted a breach of its duties as Collateral Agent.

Accordingly, BoA's motion to dismiss Plaintiffs' claims under the Security Agreement is denied.

## VI. PLAINTIFFS LACK STANDING UNDER THE DEPOSITARY AND CUSTODIAL AGREEMENTS AND THE MARCH 2009 LETTER

 To state a claim for breach of contract or for indemnification, a claimant must show either that it is a party to the relevant agreement or that the contracting parties intended the claimant to be a third-party beneficiary with enforcement rights. *See Binghamton Masonic Temple Inc. v. City of Binghamton,* 213 A.D.2d 742, 623 N.Y.S.2d 357, 360–61 (1995). Where a claimant is neither a party nor named as a third-party beneficiary, and where the operative contract expressly negates any intent to allow enforcement by unidentified third parties, the claimant is barred from enforcing a claim under that contract, *India.Com, Inc. v. Dalal,* 412 F.3d 315, 321 (2d Cir.2005).

### A. Plaintiffs Lack Standing to Sue for Breach of the Depositary Agreement

 Plaintiffs allege that BoA breached the Depositary Agreement by certifying documents that it received from TBW on Ocala's behalf and that allegedly contained false statements of Ocala's collateral and by issuing new notes pursuant to such documents. (DB AC ¶¶ 120–30, 254; BNP AC ¶¶ 134–46.) BoA contends that Plaintiffs lack standing to bring claims under this agreement, because they are "neither parties to, nor third-party beneficiaries of, the Depositary Agreement, which contains an express provision disclaiming any intent by the contracting parties to permit enforcement by non-parties." (BoA Mem. 57.)

Section 15 provides that "no Person not a party to this Agreement shall be deemed to be a third-party beneficiary hereof nor shall any Person be empowered to enforce the provisions of this Agreement," except for the Indenture Trustee or the respective "permitted" successors or assigns of the parties and the Indenture Trustee.

---

8. Not only was the segregation of collateral into sub-accounts required under the provisions of the Security Agreement, it was also mandated by federal law. *See* 12 C.F.R. § 9.13(b) ("Separation of fiduciary assets. A national bank shall keep the assets of fiducia-ry accounts separate from the assets of the bank. A national bank shall keep the assets of each fiduciary account separate from all other accounts or shall identify the investments as the property of a particular account, except as provided in § 9.18.").

Plaintiffs concede that the only parties to the Depositary Agreement are Ocala and BoA, as Depositary, and that BoA as Indenture Trustee is the only named third-party beneficiary. Nonetheless, they claim that one of the primary purposes of the Facility Documents—to protect holders of the Ocala Notes—would be undermined if they are unable to enforce the Depositary Agreement or any Facility Documents that impacted their interests in the Ocala facility.

As BoA points out, however, not all of the Facility Documents related to, or created rights for, Ocala noteholders. The Depositary Agreement embodies the respective obligations between Ocala and BoA, as Depositary and as Indenture Trustee. On its face it does not permit enforcement by Plaintiffs. The Base Indenture and Security Agreement, by contrast, do explicitly create rights for Plaintiffs, as noteholders, and allow enforcement through third-party beneficiary provisions.

Plaintiffs seek to enforce the Depositary Agreement by asserting two forms of substitute standing, in which they seek to step into the shoes of BoA, which is a named third-party beneficiary in its status as Indenture Trustee. First, the BNP Plaintiffs assert "derivative" standing "through BoA." (BNP Opp. 31–32.) Second, DB argues that it may step into the Indenture Trustee's shoes pursuant to the doctrine of *Cestuis que trustent*. (DB Opp. 32.) Both Plaintiffs rely on what the BNP Plaintiffs refer to as "no action" cases, in which courts have waived demand requirements in derivative suits and similar actions.

Although the BNP Plaintiffs call their action "derivative," and the *Cestuis que trustent* cases cited by DB involve derivative claims in which a beneficiary steps into the shoes of a trustee incapable of acting on behalf of the trust, *see Riviera*

*Cong. Assocs. v. Yassky*, 18 N.Y.2d 540, 547, 277 N.Y.S.2d 386, 223 N.E.2d 876 (1966); *Velez v. Feinstein*, 87 A.D.2d 309, 451 N.Y.S.2d 110, 115 (1982), neither the BNP Plaintiffs nor DB are suing for the benefit of a trust or other entity. They are suing for their own losses. Their claims are not derivative and, as such, the analogy to derivative claims, in which a party may pursue a claim belonging to someone else, does not apply to the claims at issue here.

All of the "no action" cases cited by Plaintiffs address the issue of whether a pre-suit demand clause barred the action or whether some exception to the demand requirement, such as futility, was present. *See, e.g., Cruden v. Bank of N.Y.*, 957 F.2d 961, 967–68 (2d Cir.1992); *In re New York Hous. Dev. Corp.*, No. 86–CV–3274, 1987 WL 494921, at *9 (S.D.N.Y. May 11, 1987); *Gould v. J. Henry Schroder Bank & Trust Co.*, 78 A.D.2d 870, 433 N.Y.S.2d 32, 33–34 (1980); *Sterling Fed. Bank v. Credit Suisse First Boston Corp.*, No. 07–C–2922, 2008 WL 4924926, at *11 (N.D.Ill. Nov. 14, 2008). These cases are inapposite because Plaintiffs' claims under the Depositary Agreement are not, in fact, derivative claims, and the provision in Section 15 barring enforcement by unidentified third parties is not a "no-action" clause.

DB attempts to analogize BoA's duties as Indenture Trustee to those of an ordinary trustee. However, unlike an ordinary trustee, an Indenture Trustee is not subject to the duty of "undivided loyalty" that gives rise to the *Cestuis que trustent* standing upon which DB seeks to rely. *See Elliott Assocs.*, 838 F.2d at 71 ("an indenture trustee is more like a stakeholder" (emphasis omitted)). Because an indenture trustee's interests are not identical to the noteholders' interests, it does not follow that rights assigned to an indenture

trustee were intended to be enforced by noteholders. *See id.*

■ Plaintiffs also asserts that the indemnification clause in Section 8(g) of the Depositary Agreement, which provides for indemnification of "Secured Parties," defined to include noteholders, gives them third-party beneficiary rights, despite the express preclusion of such rights in Section 15. They argue that a contrary reading allows for no circumstances under which Plaintiffs, although indemnified for "any and all ... losses," could bring an indemnity claim. However, any indemnification to which Plaintiffs would be entitled could be sought only by a party with standing to enforce the provision, standing which Plaintiffs do not have. *See Control Data Sys., Inc. v. Computer Power Group, Ltd.,* No. 94 Civ. 5396, 1998 WL 178775, at *2–3 (S.D.N.Y. Apr. 15, 1998). Under New York law, contracting parties may simultaneously elect to confer a benefit or right upon a third party and to limit that right, including by limiting the third party's enforcement powers. *See, e.g., Consol. Edison, Inc. v. Ne. Utils.,* 426 F.3d 524, 528 (2d Cir.2005) (although contract "clearly created a third-party right" inuring to the benefit of shareholders, that right was limited by other express terms, including one restricting third-party enforcement).

The indemnification clause explicitly covers only costs, judgments, and other losses "that the Issuer may sustain." Depositary Agreement § 8(g). Plaintiffs have alleged that Ocala sustained losses in the form of the loss of the collateral backing the Ocala Notes. (DB AC ¶¶ 200, 255.) Further, Plaintiffs argue that Section 8(g), in recognition that losses to Ocala necessarily flow through to the Ocala noteholders, plainly provides that Plaintiffs may recover these losses from BoA to the extent they were caused by BoA's negligence. However, Section 8(g) requires any indemnification

claim for costs sustained by the Issuer to be joined by Ocala, a party to the action, or another entity entitled to pursue a claim on its behalf. Plaintiffs may bring a claim for losses caused by BoA's negligence under the Security Agreement or the Base Indenture, as to both of which they have standing, but not pursuant to the indemnification provision of the Depositary Agreement.

■ The parties undoubtedly knew how to confer standing Plaintiffs in different capacities when they wished to do so. Section 10.08 of the Security Agreement, for example, provides that "the Indenture Trustee and the holders of the Notes" are "expressly declared to be third-party beneficiaries hereof." Elsewhere in the Facility Documents, including the corresponding provision of the Depositary Agreement, the parties intentionally distinguished between the Indenture Trustee and the noteholders and treated them separately. *See, e.g.,* Depositary Agreement § 15. Deliberate choices by "sophisticated, counseled parties dealing at arm's length" in a "multimillion dollar transaction" must be given effect. *Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 574–75, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986). This is particularly true when the controlling agreement contains an integration clause specifying that the written document is the "entire agreement" between the parties on the subject. *See* Depositary Agreement § 23.

Accordingly, because Plaintiffs are neither parties nor named third-party beneficiaries of the Depositary Agreement, and because the Depositary Agreement expressly negates any intent to allow enforcement by unidentified third parties, their claims are barred under New York law. The "negating clause" is a "decisive" bar to such enforcement, particularly where, as here, the contract also contains a prohibition on assignment. *See In-*

*dia.Com,* 412 F.3d at 321; *Nepco Forged Prods., Inc. v. Consol. Edison Co.,* 99 A.D.2d 508, 508, 470 N.Y.S.2d 680 (N.Y.App.Div.1984) (provision "expressly negating an intent to permit enforcement by third parties" is "decisive").

**B. *The BNP Plaintiffs Lack Standing to Sue under the March 2009 Letter***

 The BNP Plaintiffs also claim that BoA is liable under the March 2009 Letter for losses they incurred as a result of BoA's allegedly negligent breach of the Depositary Agreement. They characterize the March 2009 Letter as a separate and independently enforceable agreement, rather than an amendment to the Depositary Agreement. (*See* BNP Opp. 38.)

BoA contends that the BNP Plaintiffs lack standing to sue under the March 2009 Letter for two reasons: (1) despite the BNP Plaintiffs' characterization of the letter as a separate agreement, it is in fact a legally ineffective amendment of the Depositary Agreement; and (2) even if it were a valid amendment, it does not purport to alter Section 15 of the Depositary Agreement disclaiming any intent to create third-party beneficiary rights and prohibiting assignment, nor does it purport to elevate either BNP Plaintiff to the status of a third-party beneficiary of the Depositary Agreement.

Section 13 of the Depositary Agreement states that "[n]o amendment, modification, termination or waiver of any provision of this Agreement shall be effective unless the same shall be (i) in writing and signed by all of the parties hereto and (ii) accompanied by the written confirmation of each Rating Agency that same will not result in a reduction or withdrawal of its then current rating, if any, of the Short Term Notes." BNP has not alleged satisfaction of either condition to render the March 2009 Letter an effective amendment. The letter was not signed by Ocala, which is a party to the Depositary Agreement, and there is no claim or evidence of any sign-off by the Rating Agencies. Where a contract provides a procedure for amending contract provisions, that procedure must be followed to execute a valid amendment. *See, e.g., Deutsche Bank AG v. JPMorgan Chase Bank,* No. 04 Civ. 7192, 2007 WL 2823129, at *23–*24 (S.D.N.Y. Sept. 27, 2007), *aff'd,* 331 Fed.Appx. 39 (2d Cir.2009) (where contract provides that no amendment is valid "unless in writing and signed" by certain required parties, the absence of such signatures invalidated a purported amendment); *John St. Leasehold LLC v. F.D.I.C.,* 196 F.3d 379, 382 (2d Cir.1999) (New York law enforces contractual requirements that amendments be in writing and signed by the parties).

In response, the BNP Plaintiffs argue that the document need only be signed "by the party against whom enforcement is sought." (BNP Opp. 38 n. 30.) Thus, according to the BNP Plaintiffs, all that is needed is BoA's signature, because BoA is the only party to the March 2009 Letter against which enforcement is sought. They also argue that the lack of Rating Agency confirmation is irrelevant because BoA's subsequent performance clearly refers to the March 2009 Letter and such "partial performance renders an amendment valid." (*Id.*) However, all of the cases on which the BNP Plaintiffs rely concern only the statutory requirement for amendments to agreements that contain a prohibition against oral modifications. *See Karel v. Clark,* 129 A.D.2d 773, 514 N.Y.S.2d 766, 767 (1987); *DFI Commc'ns, Inc. v. Greenberg,* 41 N.Y.2d 602, 394 N.Y.S.2d 586, 363 N.E.2d 312, 314–16 (1977); *Fairchild Warehouse Assocs., LLC v. United Bank of Kuwait, PLC,* 285 A.D.2d 444, 727 N.Y.S.2d 153, 153 (2001).

In none of the cases did the court refuse to enforce express requirements for amendments. *See, e.g., GLC Securityholder LLC v. Goldman, Sachs & Co.,* 74 A.D.3d 611, 612, 905 N.Y.S.2d 27 (N.Y.App.Div.2010) ("There is no merit to plaintiff's argument that the provision of the indenture barring oral modifications authorizes amendments to be made by any writing signed by the party to be charged.")

■ The BNP Plaintiffs' argument that the March 2009 Letter is a separate agreement fails because the letter, on its face, purports to enforce obligations and assert rights created by the Depositary Agreement—specifically, the letter provides for indemnification for claims of wrongdoing "in the performance of [BoA's] duties under the Depositary Agreement." Any such expansion of the rights and obligations set forth in the Depositary Agreement could only be accomplished through a valid amendment of the Depositary Agreement under Section 13.[9]

Regardless of whether the March 2009 Letter is a valid amendment or expansion of the Depositary Agreement, the letter does not purport to amend Section 15, which precludes BNP and BNPP from suing as third-party beneficiaries or in any other capacity. On its face, it contains an agreement by BoA to expand indemnification coverage to include losses incurred by the BNPP, as opposed to covering only losses suffered by Ocala. It does not, however, expand the list of entities that may enforce the Depositary Agreement as third party beneficiaries to include BNP. *See Control Data,* 1998 WL 178775, at *2–*3.

■ Furthermore, even if the BNP Plaintiffs could bring a claim for indemnification under the March 2009 Letter, the language of the indemnification clause is limited to claims brought by third-parties, not claims by the indemnitee against the indemnitor. New York law construes indemnity clauses not to cover claims by the indemnitee against the indemnitor unless the coverage language indicates an "unmistakably clear" intent to include such claims, *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 21 (2d Cir.1996), or is "exclusively or unequivocally referable to claims between the parties themselves," *Hooper Assoc., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 367, 548 N.E.2d 903 (1989). Here, no such "unmistakably clear" language "exclusively or unequivocally" includes such claims.

The language in the letter closely parallels that in *Hooper,* where the court found dispositive the requirement that the plaintiff " 'promptly notify' defendant of 'any claim or litigation to which the indemnity set forth . . . shall apply' " and that the defendant " 'assume the defense of any such claim.' " 549 N.Y.S.2d at 367, 548 N.E.2d 903. The March 2009 Letter contains similar language, with the additional requirement that BoA to give notice to the

---

**9.** BoA argues that the integration clause of the Depositary Agreement, Section 23, also precludes any expansion of the Depositary Agreement other than in accordance with the "signed written amendment" requirement of Section 13. However, integration clauses only apply to preclude alleged agreements made prior to the signing of the contract containing the integration clause, not those made subsequent to the written contract. *Getty Ref. & Mktg. v. Linden Maint. Corp.,* 168 A.D.2d 480, 562 N.Y.S.2d 721, 722 (1990) ("[n]either the parol evidence rule nor the merger clause of the underlying contract prohibits proof of a subsequent additional agreement or of a subsequent modification of the original agreement"); *Vysovsky v. Glassman,* No. 01–Civ–2531, 2007 WL 3130562, at *7 (S.D.N.Y. Oct. 23, 2007) (integration clause in Subscription Agreement did not bar the enforcement of oral contracts negotiated after the signing of the agreement).

BNP Plaintiffs of any covered claims, which indicates that it was not intended to cover a claim by the BNP Plaintiffs against BoA.

The BNP Plaintiffs contend that the clear purpose of the March 2009 Letter was to expand indemnification to cover not just Ocala's losses, but losses incurred by the BNP Plaintiffs as well, and that it must therefore cover first-party claims. Although the letter may have been intended to correct the problem that the Depositary Agreement covers only Ocala's losses, under New York law the language in the March 2009 Letter still covers only claims by third parties, not claims between indemnitor and indemnitee. *See id.* Even if the letter added indemnification for the losses incurred by the BNP Plaintiffs, it did not expand the types of claims that might be covered to include first-party claims.

The BNP Plaintiffs contend that this reading is unintelligible because there could be no conceivable third-party claim. However, the Swap Counterparty indemnitees could face suits by noteholders, subordinated noteholders, or Ocala, among others. The fact that BNP, as noteholder, would be unlikely to sue its affiliate, BNPP, as Swap Counterparty, does not affect this analysis, because they are formally distinct entities and because other noteholders, such as DB, could sue BNPP.[10]

### C. *Plaintiffs Lack Standing to Sue for Breach of the Custodial Agreement*

■ Plaintiffs allege that BoA breached the Custodial Agreement by failing to maintain adequate controls over loans removed from Ocala's Custodial Account. (BNP AC ¶¶ 187–89; DB AC ¶¶ 266–68.) BoA contends that, as with the Depositary Agreement, Plaintiffs lack standing to bring claims under the Custodial Agreement.

The Custodial Agreement does not identify Ocala noteholders as parties or third-party beneficiaries, and only names BoA, as Collateral Agent, and the Swap Counterparties as the intended third-party beneficiaries with enforcement rights. *See* Custodial Agreement §§ 20, 25. To surmount this obstacle, Plaintiffs again argue that they may step into the shoes of BoA, as Collateral Agent, and enforce the Custodial Agreement. (*See* BNP Opp. 31–32; DB Opp. 31–32.) These arguments fail for the reasons set forth above with respect to BoA as Indenture Trustee under the Depositary Agreement.

BNP suggests that BNPP, its parent company, a Swap Counterparty and third-party beneficiary under the Custodial Agreement, and now a Plaintiff, may pursue a claim for losses on behalf of its noteholder affiliate, BNP, which is not a third-party beneficiary. (BNP Opp. 37–38.) DB also appears to rely to some extent on its status as Swap Counterparty, but has backed away from this argument in its opposition brief. (DB Opp. 33.) The BNP Plaintiffs cite *Control Data*, which does not support its argument. The court there held that, although it was the "clear intent" of the parties that one party would indemnify the other party and its subsid-

---

**10.** The March 2009 Letter does not cover any losses incurred before its execution. "[I]n the absence of language to the contrary, an indemnity clause will not be construed to cover an injury or loss occurring before it becomes effective." 23 N.Y. Jur. Contribution § 72; *see also Quality King Distribs., Inc. v. E & M*

*ESR, Inc.,* 36 A.D.3d 780, 827 N.Y.S.2d 700, 703 (2007); *Beckford v. City of New York,* 261 A.D.2d 158, 689 N.Y.S.2d 98 (1999). Here, there is no "language to the contrary," and the letter speaks in the present tense and refers to losses the BNP Plaintiffs "may sustain."

iaries for certain liabilities, an action brought by such a subsidiary was barred by an express provision precluding third-party enforcement. 1998 WL 178775, at *2–*3. The court noted that indemnity for the subsidiary would have to be sought by an entity that was a party to the contract. *Id.* Here, by contrast, nothing in the Custodial Agreement expresses the "clear intent" to entitle BNPP to sue for noteholder losses, or more generally to entitle Swap Counterparties to sue for losses they or their affiliates may have suffered in capacities other than as Swap Counterparties.

The Facility Documents contemplate different roles for noteholders and Swap Counterparties, and the Base Indenture and Security Agreement demonstrate that the parties knew how to specify noteholder standing when they wished to do so. *See* Security Agreement § 10.08; Base Indenture § 9.7. Although Plaintiffs or their affiliates served as both noteholders and Swap Counterparties, this was not a function of the Facility Documents, but rather of DB's and BNP's decisions to invest in the facility. Plaintiffs do not have standing under Section 25, which is limited to Swap Counterparties, as opposed to noteholders, which is the only capacity in which DB and BNP claim to have suffered loss and are suing. Plaintiffs have not alleged any injury that they suffered as Swap Counterparties and the Swap Counterparties cannot enforce the Custodial Agreement on behalf of the noteholders.

This is consistent with the rule in New York that parties can be beneficiaries of or stand in privity to a contract in one, but not all, capacities. *See, e.g., Manley v. AmBase Corp.,* 337 F.3d 237, 245 (2d Cir. 2003) (clause indemnifying attorney in his individual capacity does not apply to claims against him in his professional capacity); *Kirby v. Coastal Sales Ass'n, Inc.,* 82

F.Supp.2d 193, 197–98 (S.D.N.Y.2000) (a party that signs a contract in his capacity as corporate officer may not sue on the contract in his individual capacity); *Bank of N.Y. v. River Terrace Assocs., LLC,* 23 A.D.3d 308, 310, 804 N.Y.S.2d 728 (N.Y.App.Div.2005) (bank could not sue under an indemnity agreement for losses it incurred when acting on its own behalf, v/hen the agreement indemnified bank only for acts undertaken in its capacity as agent for other banks).

DB argues that its standing rests not on its status as a Swap Counterparty, but on the following language from a recital in the Custodial Agreement: "The Custodian acknowledges and agrees that all of the rights of the Issuer under this Agreement are being assigned to the Collateral Agent for the benefit of the Secured Parties." Custodial Agreement at 2.

This language assigning Ocala's rights "to the Collateral Agent for the benefit of the Secured Parties" appears again in Section 3 of the Custodial Agreement. In both instances, the language is to be interpreted "[i]n accordance with Section 20," which states that "all the rights of the Issuer under this Agreement have been assigned to the Collateral Agent for the benefit of the Secured Parties pursuant to the Security Agreement." The recital thus records the fact that there is a separate agreement, namely the Security Agreement, under which the Issuer has assigned rights to the Collateral Agent for the benefit of the Secured Parties. It does not convert the Secured Parties into third party beneficiaries of the Custodial Agreement.

 Furthermore, the Custodial Agreement has two third-party beneficiary clauses that name, respectively, the Collateral Agent and the Swap Counterparties, not noteholders such as DB and BNP. *Id.* §§ 20, 23. The fact that DB and BNP are

referenced as incidental beneficiaries in the language cited above does not, by itself, confer a right to enforce the contract in light of the provisions explicitly identifying third-party beneficiaries and delineating their rights. Status as a third-party beneficiary does not imply standing to enforce every promise within a contract, including those not made for that party's benefit. *See Coal. of 9/11 Families, Inc. v. Rampe,* No. 04 Civ. 6941, 2005 WL 323747, at *2 (S.D.N.Y. Feb. 8, 2005) ("[T]hird parties may sue to enforce rights or obtain benefits under a contract only to the extent that the contracting parties specifically intended to provide the third parties with such rights or benefits."); *Nationwide Auction Co. v. Lynn,* No. 90 Civ. 7643, 1996 WL 148489, at *11 (S.D.N.Y. Apr. 1, 1996) ("To allow a third party to enforce a promise of which it was not an intended beneficiary would run contrary to well-settled law.").

## VII. PLAINTIFFS FAIL TO STATE A CLAIM FOR INDEMNIFICATION

Plaintiffs have alleged claims for indemnification for the first-party investment losses they suffered as noteholders by virtue of alleged breaches of duty by BoA. (*See* DB AC ¶¶ 274–75, 279–80; BNP AC ¶¶ 163, 173, 175, 198.) These claims are brought under the Security, Collateral, and Depositary Agreements, and in the March 2009 Letter specific to the BNP Plaintiffs.

■ Under New York law, indemnification clauses "must be strictly construed so as not to read into [them] any obligations the parties never intended to assume." *Haynes v. Kleinewefers and Lembo Corp.,* 921 F.2d 453, 456 (2d Cir. 1990). A party seeking contractual indemnification must show a specific intent to allow that party to recover under the clause. *See Bank of N.Y.,* 23 A.D.3d at

310, 804 N.Y.S.2d 728. Where the indemnity clause extends only to a plaintiff's actions in a specific capacity or to specific types of losses, that limitation will be given effect. *Id.; see also TIC Holdings, LLC v. HR Software Acquisitions Group, Inc.,* 301 A.D.2d 414, 415, 755 N.Y.S.2d 19 (N.Y.App.Div.2003).

■ Further, as set forth above, indemnification clauses are not construed to cover first-party claims unless the contract makes it "unmistakably clear" that the parties intended so to provide. *See Bridgestone/Firestone,* 98 F.3d at 21 (absent "unmistakably clear" language extending indemnification to claims between indemnitor and indemnitee, provision must be construed as limited to actions brought by third parties against the indemnitee). Unless the indemnification clause refers "exclusively or unequivocally" to claims between the indemnitor and indemnitee, the court "must find the agreement to be lacking evidence of the required intent" to cover such claims. *Sequa Corp. v. Gelmin,* 851 F.Supp. 106, 110–11 (S.D.N.Y.1994) (dismissing first-party "indemnity" claims); *Bourne Co. v. MPL Commc'ns, Inc.,* 751 F.Supp. 55, 57–58 (S.D.N.Y.1990) (same); *see also GEM Advisors, Inc. v. Corporación Sidenor, S.A.,* 667 F.Supp.2d 308, 329–30 (S.D.N.Y.2009) (indemnification clause will not be construed to cover suits between indemnitor and indemnitee unless the parties "explicitly provide" such coverage).

■ This rule is consistent with the general view of indemnity under New York law as a mechanism that enables a party liable on a third-party claim, the indemnitee, to shift that loss to another, the indemnitor. *See Mas v. Two Bridges Assocs.,* 75 N.Y.2d 680, 690, 555 N.Y.S.2d 669, 554 N.E.2d 1257 (1990) (indemnity means that "a party held legally liable to plaintiff shifts the entire loss to another"); *Weissman v. Sinorm Deli, Inc.,* 88 N.Y.2d

437, 446, 646 N.Y.S.2d 308, 669 N.E.2d 242 (1996) ("In an indemnification the entire loss is shifted from the person who has been compelled to pay (the indemnitee) to another upon the imposition of a contingent liability."). Accordingly, the default presumption in New York courts is that indemnification involves liabilities, losses, or claims associated with third-party suits, rather than contractual damages or losses between the contracting parties themselves. *See, e.g., Madeira v. Affordable Hous. Found., Inc.*, 323 Fed.Appx. 89, 91 (2d Cir.2009) (contractual right to indemnification accrues only when the "indemnified party has satisfied the judgment, *i.e.*, suffered a loss").

As discussed above, the indemnification clause in the Custodial Agreement does not extend to noteholders such as Plaintiffs, and the Depositary Agreement indemnification clause covers only losses suffered by Ocala, not losses suffered by Plaintiffs or other noteholders. Also, as discussed above, the March 2009 Letter is not a proper amendment of the Depositary Agreement and, even if it were proper, it does not contain language demonstrating an "unmistakably clear" intent to cover first-party losses of the sort that Plaintiffs allege here. *Bridgestone/Firestone*, 98 F.3d at 20–21. Nor is the indemnification language in the March 2009 Letter "exclusively or unequivocally referable to claims between the parties themselves." *Hooper*, 549 N.Y.S.2d at 367, 548 N.E.2d 903.

Plaintiffs' remaining indemnification claims fail because none of the indemnification clauses contains language demonstrating an "unmistakably clear" intent to cover first-party losses.

### A. *Plaintiffs' Indemnification Claims under the Custodial Agreement Fail*

■ Section 17, the indemnification provision of the Custodial Agreement, does not cover claims by Plaintiffs in their capacity as noteholders. Even if Plaintiffs had standing to enforce Section 17, their claims fail because the language of the provision does not cover first-party claims by the indemnitee against the indemnitor.

Section 17 of the Custodial Agreement provides for indemnification of "the Issuer, the Seller, the Servicer, each Swap Counterparty, their respective Affiliates, their respective directors, officers, trustees, employees and agents." Plaintiffs construe the references to "Affiliates" to include them, as noteholders who are affiliated with Swap Counterparties. However, Plaintiffs are suing in their capacity as noteholders, a capacity that the parties specifically chose not to cover in this provision and in the Custodial Agreement generally. There is no support in the Custodial Agreement or the law for the proposition that a party to an indemnity provision could recover losses sustained in an entirely different capacity from the one for which indemnity was extended. Not surprisingly, New York law forbids such a result, holding that when contracting parties specify a right to sue in one capacity, no right to sue in another capacity should be implied. *See, e.g., Manley*, 337 F.3d at 245; *Kirby*, 82 F.Supp.2d at 197; *Bank of New York*, 23 A.D.3d at 310, 804 N.Y.S.2d 728.

The contracting parties' consistent description of duties and rights owed to entities by reference to their capacities, such "Noteholder" or "Swap Counterparty" or "Seller," as opposed to simply using the entities' proper names, is consistent with the intention to keep those capacities separate. *See Compania De Vapores Arauco Panamena S.A. v. Moore–McCormack Lines*, 91 F.Supp. 545, 549 (E.D.N.Y.1950) (finding the fact that multiple contracts

were made, and that the defendant assumed multiple capacities to be "evidence of an intention to keep its functions separate").

Moreover, Plaintiffs' argument that the "Affiliates" language implied an intention to cover indemnified parties in capacities other than those specified fails for two reasons. First, it is inconsistent with the rule of construction that indemnification provisions "must be strictly construed so as not to read into [them] any obligations the parties never intended to assume." *Haynes,* 921 F.2d at 456. Second, it contravenes the requirement in Section 19(a) of the Custodial Agreement that "[t]he Custodian shall have no duties or responsibilities except those that are specifically set forth herein."

The BNP Plaintiffs also argue that the reference to "Affiliates" in Section 17 would be meaningless if read to cover only losses to BNPP as "Swap Counterparty," but not investment losses to its affiliate, BNP, as noteholder. This argument fails because BNPP still is trying to recover losses to its affiliate that are unrelated to its capacity as Swap Counterparty.

Nonetheless, as explained above, even if the indemnification provision applied to Plaintiffs, in their capacities as noteholders, their claims against BoA would not be covered. *See Bridgestone/Firestone,* 98 F.3d at 21; *Hooper,* 549 N.Y.S.2d at 367, 548 N.E.2d 903.

Plaintiffs argue that because the clause provides indemnity for losses from BoA's misconduct or breaches of the Custodial Agreement, and because no third party could sue an indemnified party for such transgressions by BoA, the clause "is not susceptible to any interpretation other than coverage of first-party losses." (DB Opp. 41; *see also* BNP Opp. 35.) As discussed above, there are "conceivable" suits that could be brought against a Swap Counterparty for which it might seek indemnity from the Custodian, including a suit brought by noteholders—DB could sue BNPP, or BNP could sue DB, for example—or subordinated noteholders, or third parties who did business with the facility and might sue the facility and related parties for their losses.

Finally, Plaintiffs contend that the reference to "all losses" in the indemnification provision means that it must cover first-party losses. (*See* BNP Opp. 36–37.) This argument ignores the rule requiring that the intention to cover first-party losses must be "unmistakably clear," even in a provision that states that it covers "all losses." *Hooper,* 549 N.Y.S.2d at 367, 548 N.E.2d 903; *Bridgestone/Firestone,* 98 F.3d at 21. The cases cited by the BNP Plaintiffs do not alter this conclusion, as in each of those cases, the indemnitee brought a cross-claim or counterclaim against the indemnitor only after the indemnitee was sued by a third-party in order to recover judgment losses. *Hogeland v. Sibley,* 42 N.Y.2d 153, 397 N.Y.S.2d 602, 604, 366 N.E.2d 263 (1977); *Levine v. Shell Oil Co.,* 28 N.Y.2d 205, 321 N.Y.S.2d 81, 83, 269 N.E.2d 799 (1971).

The indemnity clause in the Custodial Agreement is not, as the BNP Plaintiffs assert, similar to those found to cover first-party claims in the cases cited by the BNP Plaintiffs. *See E\*TRADE Fin. Corp. v. Deutsche Bank AG,* 631 F.Supp.2d 313, 391–92 (S.D.N.Y.2009) (indemnity clause "[r]ead alone" might cover only third-party claims, but other contract language "unambiguously contemplate[d] direct actions between the parties" and directed that all such claims "be resolved within the framework" of the indemnity clause); *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 178 (2d Cir.2005) (where contract contained two nearly identical indemnity clauses, only one of which contained language limiting coverage to losses

from indemnitor's negligence, clear intent of the second was not to include such an exception); *see also Promuto v. Waste Mgmt., Inc.,* 44 F.Supp.2d 628, 650 (S.D.N.Y.1999); *Pfizer, Inc. v. Stryker Corp.,* 348 F.Supp.2d 131, 146 (S.D.N.Y. 2004).

For these reasons, Plaintiffs' indemnification claims under the Custodial Agreement are dismissed.

### B. *Plaintiffs' Indemnification Claims under the Depositary and Security Agreements Fail*

■ As set forth above, Plaintiffs lack standing to pursue claims for indemnification under the Depositary Agreement. However, even assuming Plaintiffs could bring such a claim, the fact that the operative indemnification clause in the Depositary Agreement does not explicitly demonstrate an intention to cover first-party claims between indemnitee and indemnitor is fatal. The claims under the Security Agreement suffer from the same flaw.

Plaintiffs contend that the references to third-party claims in the Depositary and Security Agreements make it "unmistakably clear" that the respective indemnification provisions were meant to cover first-party claims as well as third-party claims. Their reliance on *Promuto,* 44 F.Supp.2d at 650, and *Pfizer,* 348 F.Supp.2d at 146, is misplaced. In *Pfizer,* the court reasoned that, because the agreement included two sets of procedures for notice of claims, only one of which addressed third-party claims, the other would be surplusage unless construed to refer to first-party claims. Here, however, the agreements each establish only one notice of claims procedure. *See* Depositary Agreement § 8(g); Security Agreement § 8.05. Thus, the fact that the single notice provision in each Agreement references claims by a "third party" actually strengthens the point that the indemnification provisions in

the Agreements cover only third-party claims. *See Sequa,* 851 F.Supp. at 111.

In *Sequa,* where the notice and assumption of defense clause applied only to "actions by third-parties," the court rejected the argument that an indemnification clause expressed the parties' intent to cover both first- and third-party claims. *Id.* at 111 n. 7. In that case, the plaintiff made a surplusage argument similar to the argument offered by Plaintiffs in this case, but the court rejected it, noting that the clause referenced a set of recoverable events, including "actions, suits, costs, expense, and disbursements," and that the reference to "actions by third-parties" did not distinguish "third-party" claims, but rather "actions" as opposed to other sorts of claims. *Id.* at 111 n. 7, 108 n. 2. The recoverable items here include "claims, losses, penalties," etc., so the reference to notice and assumption of defense as regards a "claim ... made by a third party" is best read as apply when a third-party recoverable entails notice and assumption of defense, namely, when there is a "claim" by a third-party. *Cf. Promuto,* 44 F.Supp.2d at 650–51 (third-party notice provision applied to "third-party claims" and claims were not a subset of the recoverables in indemnification clause).

Accordingly, the fact that third party actions are explicitly referenced in the indemnification provision does not amount to language that demonstrates an "unmistakably clear" intent to cover first-party losses. *Bridgestone/Firestone,* 98 F.3d at 20–21; *Hooper,* 549 N.Y.S.2d at 367, 548 N.E.2d 903; *Sequa,* 851 F.Supp. at 111 n. 7.

### VIII. PLAINTIFFS LACK STANDING TO SUE BASED ON OCALA NOTES ISSUED BEFORE JULY 20, 2009

■ BoA argues that even if it breached the Facility Documents between Janu-

ary 25, 2008 and July 20, 2009, it cannot be liable for those breaches because Plaintiffs received full payment on the Ocala Notes each time they were rolled over. Thus, BoA argues, Plaintiffs lack standing to bring a claim based on events prior to the issuance of the July 20, 2009 Ocala Notes, because their status as noteholders has expired as to all Ocala Notes prior to those issued on July 20, 2009.

The authorities cited by BoA stand for the proposition that a noteholder who is paid in full may not sue the borrower for breaches of the note or undertakings made by the borrower to support the note. *See e.g.,* 83 N.Y. Jur. 2d *Payment and Tender* § 141 (West 2010) (legally sufficient tender discharges collateral undertakings by the borrower, such as mortgages, liens and pledges); *In re Paradis' Estate,* 134 Me. 333, 186 A. 672, 675 (1936) ("When commercial paper is paid by the party whose debt it appears to be, it becomes *functus officio,* commercially dead.").

Plaintiffs argue that they are not suing BoA for Ocala's failure to pay the principal due on the Ocala Notes themselves or in respect of related undertakings made by Ocala in connection with issuance of the Ocala Notes. Rather, they are suing for BoA's alleged breaches of the Facility Documents that resulted in the loss of the collateral that was supposed to be backing the Ocala Notes. Plaintiffs contend that BoA executed the Facility Documents on June 30, 2008, and those documents still govern and control BoA's duties and responsibilities to Ocala and the noteholders,

that such duties did not cease on repayment of a particular note issue and begin anew on the issuance of new notes and that, for this reason, BoA did not enter into new Facility Documents for each roll of the notes. For this reason, Plaintiffs contend that BoA's argument that "payment of the earlier notes extinguished any related contract claims as a matter of law" misses the point.[11]

DB has alleged that BoA's breaches of the Facility Documents caused Ocala to lose the cash and mortgages that would have been available to repay the principal due on the Ocala Notes issued on July 20, 2009, and that this loss of collateral proximately caused the Ocala Notes to lose their value. Based on this allegation, each rollover of Ocala Notes did not extinguish claims on those notes because each rollover was premised on BoA's continued performance of its duties under the Facility Documents. DB has also alleged that BoA's breaches of the Facility Documents on July 20, 2009 caused it to roll over its investment in Ocala Notes and thereby proximately caused its loss.

However, even Plaintiffs have acknowledged that each new issuance of Ocala Notes was a "separate transaction." (*See* BNP AC ¶ 42; DB AC ¶ 5.) Accordingly, BoA contends that they were not revolving or "recurring" debt obligations, and that the situation is no different from one where a noteholder whose note was repaid decided not to reinvest, and a new noteholder purchased a later issue of notes. In that case, the new noteholder could not sue

**11.** Plaintiffs argue that the cases cited by BoA also miss the point, as each involved nonrecurring debt obligations that were extinguished and whose governing documents expired or terminated upon payment at final maturity. *See Green v. Foley,* 856 F.2d 660 (4th Cir.1988) (non-recurring bank notes); *Bank of Lexington v. Jack Adams Aircraft Sales, Inc.,* 570 F.2d 1220 (5th Cir.1978)

(non-recurring aircraft mortgage); *In re Paradis' Estate,* 134 Me. 333, 186 A. 672 (1936) (a single issuance of commercial paper); *Great W. Bank v. Kong,* 90 Cal.App.4th 28, 108 Cal.Rptr.2d 266 (2001) (single commercial mortgage); *Caplan v. Unimax Holdings Corp.,* 188 A.D.2d 325, 325, 591 N.Y.S.2d 28 (N.Y.App.Div.1992) (single debenture).

for a breach that occurred before it purchased the new notes. Thus, according to BoA, the fortuity that Plaintiffs were both the new and the old noteholders is irrelevant.

Plaintiffs' standing to sue under the Base Indenture and Security Agreement derives from their third-party beneficiary status as "Noteholders." For this reason, Plaintiffs' status as noteholders, and their resulting standing to sue for breaches while they held the notes, was legally extinguished each time they received payment in full on their notes. *See* 70 C.J.S. Payment § 32 (payment "extinguishes the debt for which it is presented"). Plaintiffs could not have retained noteholder status after the attendant Ocala Notes were paid and extinguished and only obtained noteholder status again upon the acquisition of the new Ocala Notes. *See Caplan v. Unimax Holdings Corp.*, 188 A.D.2d 325, 325, 591 N.Y.S.2d 28 (N.Y.App.Div.1992).

DB's argument that BoA's alleged breaches "caused DB to roll over its investment in the Ocala Notes," (DB Opp. 35) suggests that DB might have been fraudulently induced into rolling over its notes and acquiring new notes, but it has not pleaded such a claim in its Amended Complaint.

Finally, Plaintiffs argue that any breaches by BoA prior to July 20, 2009 and BoA's knowledge of Ocala's insolvency during the lifetime of the Facility are evidentiary and/or causation issues that cannot be determined on a motion to dismiss. *In re Morgan Stanley ERISA Litig.*, 696 F.Supp.2d 345, 363 (S.D.N.Y.2009) (Generally, "loss causation is an issue of fact and is thus not properly considered at this early stage in the proceeding" (quotation marks omitted)); *see also Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F.Supp.2d 258, 271–72 (S.D.N.Y.2004) (whether there is a causal

connection between alleged contract breaches and damages are questions to be addressed at summary judgment or at trial, not on a motion to dismiss).

However, this is an issue of standing, rather than causation or evidence, and is therefore properly raised and resolved at this stage. *See Wolfson v. Conolog Corp.*, No. 08 Civ. 3790, 2009 WL 465621, at *3 (S.D.N.Y. Feb. 25, 2009).

Plaintiffs therefore lack standing to bring claims based upon Ocala Notes issued prior to July 20, 2009.

## IX. BNPP IS NOT A PROPER PARTY TO THIS ACTION

 The claims of BNPP, which was added to the Amended Complaint filed by the BNP Parties, fail as a matter of law because BNPP has not alleged that it suffered any injury in its capacity as Swap Counterparty or otherwise. Nor can BNPP sue for injuries suffered by its subsidiary, BNP. *See, e.g., Hudson Optical Corp. v. Cabot Safety Corp.*, No. 97–9046, 1998 WL 642471, at *3 (2d Cir. Mar. 25, 1998) (unpublished) (holding that a parent corporation lacks standing to sue for injuries allegedly sustained by its subsidiary); *Alexander & Alexander of N.Y. Inc. v. Fritzen*, 114 A.D.2d 814, 495 N.Y.S.2d 386, 388 (1985) ("[O]ne corporation will generally not have the legal standing to exercise the rights of other associated corporations."), *aff'd*, 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986); *see also Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*, 861 F.Supp. 179, 181 (E.D.N.Y.1994) ("A corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined.").

 BNPP's claim for breach of fiduciary duty also fails because BNPP does not allege any fiduciary duty owed to it by

BoA, a breach of any such duty, or damages directly caused by such a breach. *See Daly v. Kochanowicz,* 67 A.D.3d 78, 95, 884 N.Y.S.2d 144 (N.Y.App.Div.2009). The Amended Complaint merely states that "Bank of America owed [BNP] and the other Noteholders" a duty to act as a prudent person would in the conduct of his own affairs. (BNP AC ¶ 209.)

Because BNPP has not alleged any injury to itself, it lacks standing and its claims are therefore dismissed.

## X. CONCLUSION

Based upon the foregoing, Defendant's motion is granted as to the claims for breach of the Depositary Agreement, Custodial Agreement, and March 2009 Letter, the claims of DB based upon prior versions of the Facility Documents, the claims for indemnification, the claims relating to Ocala Notes issued prior to July 20, 2009, and all of BNPP's claims, and denied as to all remaining claims.

It is so ordered.